**NATIONAL LABOR RELATIONS BOARD  
v. CHICAGO APPARATUS CO.**

No. 7311.

Circuit Court of Appeals, Seventh Circuit.

Dec. 12, 1940.

Rehearing Denied Jan. 27, 1941.

754

Robt. B. Watts, of Washington, D. C., for petitioner.

Loy N. McIntosh and Frederick Secord, both of Chicago, Ill., for respondent.

Before EVANS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Petitioner seeks to enforce its order issued against respondent, the employer, pursuant to Section 10 (c) of the National Labor Relations Act, 49 Stat. 449, 453, 29 U.S.C.A. § 160(c). Charges were filed by the Federation of Architects, Engineers, Chemists and Technicians, Local No. 107, with the Board, and the latter issued its complaint thereon December 6, 1937, in which it was alleged that the employer, in order to discourage membership in the Federation, had discharged and refused to reinstate four of its employees, Alban Mirguet, Joseph Doyle, Patrick Doyle, and Clark Heppe, because of their affiliation with and activities in the Federation; that the employer had interfered with, restrained and coerced its employees in the exercise of their rights to self-organize; and has refused to bargain collectively with its employees through the Federation although a majority of the employees had selected it as their bargaining representative. All of the material allegations of this complaint were denied by the employer in its answer.

There followed a hearing before a trial examiner who, after hearing, filed his intermediate report to which exceptions were taken by the employer, and oral arguments were had before the Board. On May 17, 1939, the Board filed its decision and entered the order here in controversy. (12 N.L.R.B. 1002.)

The parties stipulated as to the facts which were determinative of the Board's jurisdiction. Therefrom it appeared that the employer is an Illinois corporation with its principal place of business in Chicago. It is engaged in the manufacturing and jobbing of apparatus and supplies such as Bunson Burners, tongs, tweezers, balances, electrical demonstration pieces, microscopes, test tubes, jars, prepared and unprepared slides, etc., for use in scientific laboratories in high schools and colleges.

Approximately twenty-five per cent. of the raw materials used in its manufacturing (which comprises one-fourth of its business) are taken from sources outside the State of Illinois. Approximately seventy-five per cent. of the merchandise used by the company in its jobbing (which comprises three-fourths of its business) is brought in from other states. Nearly seventy-five per cent. of its sales, amounting to seven hundred and fifty thousand pounds of merchandise, are made outside of Illinois. The company employs salesmen to cover these states.

The Board found that employer engaged in unfair labor practices in refusing to bargain with the Federation as the exclu-

sive bargaining representative of its employees; interfered with, restrained and coerced its employees in the exercise of their rights to self-organization; discharged three employees, A. H. Mirguet, Joseph Doyle, and Patrick Doyle, because of their union activities. The Board found that these practices violated Section 8 (1), (3), and (5) of the Act, 29 U.S.C.A. § 158 (1, 3, 5).

It ordered the company to cease such activities and upon request to bargain collectively with the Federation and to reinstate the discharged employees to their former positions without prejudice to their seniority or other rights and privileges, and to make them whole for any losses of pay which they may have suffered by reason of their discharge. The complaint was dismissed, in so far as it alleged the commission of an unfair labor practice in the discharge of Clark Heppe.

The employer denied unfair labor practices. It contends that the Federation did not represent a majority of its employees, and that, if it did, it failed to present such proof upon request; that two of the employees named were discharged for cause, and the third resigned. It denied that there was substantial evidence of coercion, interference, or domination of the employees in the exercise of their rights to self-organization.

The pleadings present several questions which we must and do now decide:

**■ (1)** *The Appropriate Unit.* The complaint alleged that a unit composed of production and maintenance employees was appropriate. The Board found, however, that a unit composed of production employees only, excluding salesmen, office employees, and supervisors having the power to hire and discharge, was appropriate.

The power to make such a finding is given to the Board. Section 9 (b) of the Act, 29 U.S.C.A. § 159(b). Unless an abuse of discretion in the exercise of such power is shown, we are not justified in overthrowing it. National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815, 819; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701.

**(2)** *The Representation of the Majority by the Federation.* The Federation is a union affiliated with the Congress for Industrial Organization, and had been in existence as a national organization for about four years at the time of the hearing. The Chicago Chapter of the Union consists of a group of several local lodges, one of which is Local No. 107.

On or about May 21, 1937, a group of fourteen of the company's employees sought information from Chicago chapter headquarters concerning its union program. One of the organizers, Kornacker, explained the principal points of its program, and what employees' rights were under the Labor Act. All of this group thereupon applied for membership in the Federation.

The following week, a second meeting was held in a Chicago auditorium. A much larger group of employees attended, and again Kornacker explained the program of the Federation. Questions concerning membership therein were asked. More men joined that evening. K. testified that fourteen signed on May 21, an additional seventeen on the twenty-eighth of May, and nineteen more by June 29, making a total of fifty. Thus, Local No. 107 came into being, some time in June, 1937. Officers were elected at subsequent meetings, by-laws adopted, and the machinery of organization perfected.

The pay-roll for the production department for the week ending July 11 shows that fifty-four employees were working. While the Board made no specific finding concerning the number of these within the appropriate unit, it did decide that three out of the fifty-four were supervisory employees and therefore should be excluded from the unit. The Board took fifty-four as the number favoring the Union. Employer on the other hand, takes forty-four as the number in the appropriate unit. It is immaterial whether the number be fifty-four, fifty-one, or forty-four, because the Federation had a majority on any hypothesis.

The record shows that fifty applications for membership had been made by June 29. Some of these were undated, but Kornacker, the organizer, testified that all of them had been made out before June 29. The employer contends, however, that many other applications show on their face that no initiation fees or dues had been paid, and so, according to the Constitution of the Federation, the applicants were not members of the Union. The Constitution provides that a member shall not be in good standing if he is three months in arrears in paying dues, and that he shall be automatically dropped from the rolls if he is

six months in arrears. The by-laws provide that "Initiation fees must be paid * * (when) applicants shall fill out regular application cards * *." Kornacker testified, in this regard, that "an employee, say, of the Chicago Apparatus Company, becomes a member of our union when he signs an application card and when he pays an initiation fee, which may or may not be waived, depending upon our organizing status at the time * *." He further testified that if the applicants' "financial circumstances are such at the time they sign a card, that they cannot afford to pay an initiation fee, we may or may not consider him a member, depending upon the decision of the chapter executive board which considers the financial position of the applicant." He further testified that no applicants for membership in the Federation were rejected for financial or other reasons.

■ It thus appears that, even though no initiation fees or dues were paid, the applicants for membership were not rejected therefor, but were considered members for the purposes of collective bargaining. It further seems clear that the applicants, in so applying, gave the Federation authority to bargain for them, for the Federation officials obtained, by August 20, the signatures of thirty-five employees within the appropriate unit to the following statement: "I, the undersigned employee of the Chicago Apparatus Company, hereby authorize the Chicago Chapter of the FAECT to represent me in collective bargaining with my employer." Application for membership may be counted in determining whether the union has a majority. National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 111 F.2d 681; National Labor Relations Board v. Bradford Dyeing Association, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226. This is true even though no dues have been paid.

Employer further contends that six applications for membership were unsigned. It is unnecessary to determine the status of these applications. From the fifty applications submitted in evidence, the following may be rejected: (1) four, because it does not appear that the applicants were in the appropriate unit; (2) two, because they were supervisory employees; and (3) six, because their application cards were not signed.

■ The conclusion is inescapable that there was substantial evidence to support the Board's finding that the Federation, on June 29, 1937, was the duly designated representative of a majority of the employees.

■ (3) *The Interference, Restraint, and Coercion.* As has been noted, the Federation began to organize the employees sometime in May, 1937, and, by June 29, had a majority in the appropriate unit. On that date, there appeared on the company's bulletin board a "Statement of Policy." It was to go into effect on July 1, 1937, and contained provisions concerning hours of employment, rates of pay, vacations, etc. In many instances, raises in pay were granted, and additional vacations with pay were given. The statement also contained provisions for handling grievances. There was a section entitled, "Open Shop and Seniority Rights." This section contained the following: "We are anxious to see our employees develop rapidly in order that they may, through their own efforts, achieve independence and have the satisfaction of having made successes for themselves. Furthermore, under the merit system, the employee does not have to ask permission of some walking delegate as to what position he may hold nor does he have to pay tribute to anyone for the privilege of working. Even a casual reader of current events described in recent developments could easily ascertain what is sought to be foisted upon American workmen. We have our freedom at the moment and we should fight to retain it. An open shop policy, based upon a merit system, will preserve this for us. * *"

The Company argues that the "issuance of said 'statement of policy' by respondent was an exercise of the right of freedom of speech and of the press, secured by the 1st and the 14th Amendments to the Federal Constitution," and cites Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, as authority for this view. But see, Gitlow v. People of New York, 268 U.S. 652, 657, 45 S.Ct. 625, 69 L.Ed. 1138.

Expressions of opinion concerning labor unions, by an employer, either written or merely spoken, may be of such a nature that their effect is to coerce and intimidate the employees, contrary to the provisions of the National Labor Relations Act. To hold that such expression, when employer manifestly intended to give them such an effect, are not violative of the Labor Act, would be to nullify the provisions of the

Act and to thwart the public policy evidenced by said Act.

However, in this case the Board made no specific finding concerning the effect of this statement of the employer's policy. A disregard of the statement entirely, does not affect the result of this case. For purposes of its effect on future cases, we hold that such a statement was relevant and material and admissible as bearing on the employer's attitude. It may have been an exercise of his Constitutional right of free speech and yet illuminative as evidence of motive, intent, and attitude towards labor union activities of the employees.

Following the issuance of this statement, there began what the Board in its brief characterized as "a campaign on the part of respondent's officials and supervisory employees to break the authority of the Union in the plant." In one instance, one of the foremen, Florian Polk, went to see one of the company officials, B, to ask his help in extricating his brother Henry from financial difficulties. B promised to see what he could do. Later B refused to help, saying that "since we (Florian and Henry Polk) were still members of the union * * * he couldn't possibly help us in so far as he would be going against the policy of the company which he led." Shortly thereafter, both of the Polks resigned from the Federation and revoked the authorizations given a short time before.

In another case B informed an employee that he was surprised that he, an office employee, should join the union, particularly because his work had been satisfactory and his background did not show any inclination to become mixed up in such affairs. He further told this employee, Young, that he could feel certain that he would retain his job with the company but that he, B, felt that he had violated a trust of responsibility which the company had given him, and that the latter felt that they therefore could not give him further responsibilities or promotion.

Another employee, Mirguet, testified that B reprimanded him for working against the company in seeking authorizations on behalf of the Federation.

There is evidence to the effect that several foremen, notably Polk, head of the chemical department, Konkey, foreman of the stockroom, Weaver, foreman of the receiving room, and Tobiasson, head of the inspection department, all actively engaged in obtaining the signatures of employees to letters purporting to repudiate their Federation membership. This was done on company time and during working hours, and was to a considerable extent successful. One employee, Berg, testified that foreman Weaver told him, in effect, that "if I did not sign it (repudiation of union membership) I might as well look for another job."

Another employee, Van Pelt, testified that Weaver "approached me two times and told me it (the Federation) was doing no good." Van Pelt resigned from the Federation. He testified as follows: "I thought after I quit there would be no use in me staying in the union; I thought maybe if I could get out I would have a better chance—well, I just wanted to get out of the union."

Tobiasson readily admitted at the hearing that he had solicited resignations. He added, however, that the plan was entirely his own, and that he had received no authority or permission from his superiors to carry it out. He was motivated entirely by his strong personal dislike of the union. He further testified that he had his stenographer type out the resignations, but that he personally paid for the stationery used and all postage due.

Foreman Konkey solicited resignations in his department with the statement to the men, "Go either way. Be with the union or be with the company; it don't make no difference to me." All six men in his department resigned. Mirguet, an employee, was told by B to resign from the Federation. He refused and eventually he was forced to resign from the company.

The employer contends that the actions of the foremen in soliciting the resignations from the Federation cannot be imputed to it because the foremen did not occupy executive positions with the company. It is therefore urged that the activities of these men were those of fellow servants insofar as the company's employees were concerned. Further it is said that the foremen were instructed not to fight the union; finally, that the management had no knowledge of the solicitations of the resignations until after the events took place, and that when it did find out it took steps to prevent occurrences similar thereto in the future.

It is clear from a careful study of the evidence that Konkey was foreman of the stockroom. He did not have power

to hire and discharge without consulting his superiors, but he could make recommendations. Florian Polk had full charge of the chemical department. Weaver had full charge of the receiving room. Tobiasson had full charge of the inspection department. All four were supervisors, and their anti-union activities must be imputed to the company. It is not necessary that those engaged in anti-union activities have the power to hire and discharge directly. It is sufficient that they occupied positions of authority, and thus represented the company. National Labor Relations Board v. American Mfg. Co., 2 Cir., 106 F.2d 61, 67, affirmed without opinion in 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988.

■ This evidence clearly sustains and supports the Board's finding that the employer, through its officers and foremen, generally pursued a policy of intimidation and coercion towards its employees. It is neither necessary nor wise to lengthen this opinion by extended quotations from the testimony. We are persuaded that in this case the evidence made it impossible for the Board to reach any other finding or conclusion.

(4) *The Refusal to Bargain.* On June 16, 1937, the Federation representative, Berne, wrote to Stoelting, president of the employer, stating that the Federation represented a majority of the production employees and requested Stoelting to set a date for a conference concerning collective bargaining.

This request was granted, and a conference was held on June 22nd. A proposal wherein the Federation was to be recognized as the sole bargaining agent for the employees in the production departments and a closed shop was to be put into effect was suggested. Rates of pay, hours of work, and grievance procedure were also demanded.

B asked for a week in which to consider the union proposals. Then, after considerable discussion on the procedure to be used in determining whether the Federation was the authorized bargaining agent for the employees, K, representing the union, made it clear that if the company questioned the union's right to represent the men, they would file a petition with the N. L. R. B. for certification or election. He explained that this had been done on previous occasions and with other companies, as the union did not wish to submit its records to the company but would rather submit them to the Board. He further asked that if the company contested the union's right he would appreciate an early notification.

A second meeting was held June 29. Several company employees were present at the request of B. As soon as the meeting came to order Bengston asked K and B if they were prepared to prove their right to represent the men. Berne and Kornacker reiterated their stand of the previous meeting. Thereupon Bengston remarked: "Inasmuch as we have no proofs, there will be no further discussion and the conference will come to an end."

The meeting terminated and shortly thereafter, at a Federation meeting, it was decided to petition for certification or election by the Board. There followed a meeting on July 27 in the offices of the regional director of the Board in Chicago at which the employer and the Federation were both represented. The company representative declined to agree to a certification on the ground that many members of the Federation had resigned therefrom since the date upon which the Federation considered that it represented a majority.

Two further meetings were held, one on August 9 and another on September 26. Nothing was accomplished at either. Finally the charge upon which the complaint in this case was predicated, was filed, because, K testified, the company's "dilatory tactics" were believed to be injurious to the Federation's cause.

■ It is not necessary, in our opinion, to decide whether the Federation continued to have a majority after the resignations were counted. If the shift in membership is brought about by the unfair labor practices of the employer, it "cannot operate to change the bargaining representative previously selected by the untrammeled will of the majority." National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 929, 84 L.Ed. 1226.

The Board found, on the basis of the facts outlined above, that the employer refused to bargain with the Federation on and after June 29th.

■■ An employer who acts in good faith is entitled to adequate proof that the union desiring to represent his employees is the properly accredited representative. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d

862, 868. However, the act declares that it is an unfair labor practice to refuse to bargain with the properly-accredited representatives. The Board is authorized to determine if and when the remedial provisions of the Act should be invoked upon a failure of the employer to bargain. If this exercise of power by the Board be not abused, the court is without authority to disturb its exercise.

(5) *Reinstatement of Discharged Employees.* The Board ordered the reinstatement of Patrick Doyle, Joseph Doyle, and Alban Mirguet.

It is difficult in the extreme to satisfy ourselves as to the facts respecting these discharges. Respondent contends that it did not even know Patrick Doyle was a member of the union; that he was discharged because he was found "loafing" on the job and that he was checking through certain factory records, which was outside of his line of duty and he could give no explanation for this action. His brother, Joseph Doyle, was also discharged. There seems to be little or no reason for his dismissal. The employee, Mirguet, was also discharged after efforts had been made to persuade him to drop out of the union.

Of the three discharged employees we are satisfied that the Board's finding that Mirguet was discharged because of his union activities, finds support in the record. In fact the issue is not one of discharge for union activities so much as it is a dispute over the query, Did he resign or was he discharged?

The dispute between the employer and this employee became heated after the former had failed to persuade the employee to resign from the union. They indulged in a challenging contest. The employee was asked: "Why don't you resign from the company?" Mirguet replied, "If you don't want me here any more, why don't you fire me?" Likewise there is evidence that the employer said, "We don't want you in our organization; get out, get out." Later when B and M met again, B said, "So you have quit," and M replied, "You told me there was no room in this organization for me; to get out." This and other evidence supports the finding that he was discharged.

Less certain is the showing for and against the Patrick and Joseph Doyle discharges. While both were union members,

Patrick was neither active nor assertive. There seems to be little or no reason for discharging Joseph other than that he was a member of the union and active in it. While the evidence is neither strong nor conclusive, yet we are not prepared to disturb the finding of the Board. From the very nature of the issue, it is difficult to prove that an employer discharged a union employee because of his union activities. It is somewhat like proving intent. We must make deductions, endeavor to read the witness' mind.

When much feeling is present words are spoken which often truly reflect the mind of the speaker. At other times the correct conclusion must depend on the fact finder's ability to interpret the facts. An inability to give any reason for Joseph's discharge, coupled with the fact that the employer was bitterly hostile to the union and all employees who were active in union work, afford the basis for the Board's finding in the case of these two Doyles.

Our duty is not to weigh the evidence but to ascertain whether there is sufficient evidence to support the Board's finding. We approach the question the same as we did the facts in the case of Foote Brothers Gear, etc., Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 611, decided by this court, July 24, 1940. In the instant case, considering all of the facts, all of the evidence, and all of the inferences which might be fairly drawn therefrom, we find ourselves unwilling to disturb the finding of the Board. It seems to us the case of Joseph Doyle is stronger than that of Patrick Doyle. In both cases we can not ignore the rather feverish opposition which the respondent displayed toward all unions and its improper efforts to defeat its employees' efforts to organize. Its hostility toward any union and its determined effort to defeat the organization of its employees into a union must be considered in determining whether an active union member was discharged for his union activities when no other satisfactory reason for the discharge appears. The Board's finding on this issue is not without some support, and we accept it.

The petition of the Board for an enforcement of its order must be and is granted. An order of enforcement will be entered.