**VALLEY MOULD & IRON CORPORATION v. NATIONAL LABOR RELATIONS BOARD.**

No. 7387.

Circuit Court of Appeals, Seventh Circuit.
Dec. 17, 1940.

Rehearing Denied Jan. 31, 1941.

Ernest S. Ballard, Ralph Bowers, Lee C. Shaw, and Merrill Shepard, all of Chicago, Ill., for petitioner.

Robt. B. Watts, Chief Counsel N. L. R. B., of Washington, D. C., for respondent.

Before EVANS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Petitioner seeks to review and the respondent to enforce an order of the National Labor Relations Board of February 5, 1940, directing petitioner to cease and desist from certain acts and to take certain affirmative action. The cause had to do with the relationship between petitioner and two labor unions, namely: Valley Mould and Iron Corporation and Steel Workers' Organizing Committee for Amalgamated Association of Iron, Steel and Tin Workers of North America, Lodge No. 1029, affiliated with the Congress of Industrial Organizations and hereinafter referred to as "Amalgamated" and the other, Valley Mould Independent Employees' Union, South Chicago Works, hereinafter referred to as "Independent." Each union participated in the hearing before the Board and the Independent has been permitted to intervene here.

In its findings and decision the Board found in substance that by derogatory and disparaging remarks and criticisms of Amalgamated and its affiliated organization, by questioning and importuning employees as to their labor affiliations and activities, by warning employees against affiliation with Amalgamated, by abusive and threatening statements to the President of Amalgamated, and by depriving him of his regular day off and by other acts and conduct, petitioner interfered with, restrained, and coerced employees in the exercise of their rights under the National Labor Relations Act. It found also that on various dates in 1938 up to and including August 19, 1938 and since that day, petitioner had refused to bargain collectively with Amalgamated, which previously had been certified by the Board as the proper collective bargaining representative of petitioner's employees, and had thereby violated section 8(1) and section 8(5) of the act which define refusal to bargain collectively with the authorized representatives of employees as an unfair labor practice; and that petitioner dominated and interfered with the formation and administration of and contributed to the support of Independent in violation of section 8(1) and (2) of the act, 29 U.S.C.A. §§ 157, 158, 159.

The order, in addition to directing petitioner to cease and desist from the unfair practice found to exist, directed it affirmatively, upon request, to bargain collectively with Amalgamated as the exclusive representatives of the employees; to withdraw recognition from and disestablish all relations with Independent as such representative; to restore to the president of Amalgamated his former privilege of taking his regular day off on Sunday and to post appropriate notices of compliance with the order.

So far as we are concerned with questions of fact, the only inquiry open to us is whether the Board's findings were supported by substantial evidence. Both petitioner and intervener contend that the record does not disclose the requisite quantum of evidence to support the findings and the Board insists that they are supported by substantial evidence.

In its decision the Board approved the findings and conclusions of its examiner, concluding as aforesaid that petitioner re-

strained and coerced its employees in the exercise of their rights under the act. The findings, recited at length, fill twelve printed pages. The substance thereof follows: Amalgamated obtained its charter on September 15, 1936. In the spring of 1937, Cook, its president, reported to Fitzgerald, the chairman of the old Employees' Representation Plan that a series of conferences concerning Employees' Representation Plan had been held in the steel industry; that a meeting was scheduled to take place in Gary. Shortly thereafter petitioner's superintendent, Shank, approached Cook and questioned him concerning the meeting, saying he would see if Mr. Swab, petitioner's vice-president, knew anything about it. On the same day, Swab called Cook in, discussed the meeting and advised Cook against attending, stating that if it was a "representative plan", he, Swab, would certainly know something about it and that he would call the steel company and ascertain the facts. Cook testified, and the Board found upon his testimony, that Swab then informed Cook that he thought this was "some of John L. Lewis' stuff"; that Cook had no business attending, that he was getting along all right, that "the silver-tongued orators will deceive the best of us" and advised Cook not to attend.

Cook was called into the office by Shank on several occasions and questioned about Amalgamated; Shank asked him how he was getting along with his membership cards and said to him, "We did not think you would do that," that Roberts, a foreman, always had high regard for Cook and considered him loyal. Thereupon Cook inquired what relation his activities had to his loyalty and he was told to see Swab. A few days later, at Shank's suggestion, Cook called at Swab's office and was questioned as to how much his union dues were. Swab commented to Cook "that it did not make sense to him why a man should have to pay for the right to work." Swab said that he had always refused to join a union because he thought he could get along without it; that the company was small and there was no necessity of its workers doing what those in other mills did, as their wages and working conditions were governed by those of the United States Steel Corporation. In April and May of 1937, Shank repeatedly told Cook that somebody had been threatened because he would not join Amalgamated and

stated that he was holding Cook accountable for this action.

Amalgamated wrote to the company in March and April, requesting a conference for the purpose of collective bargaining. On April 16, 1937, Swab called a meeting of Employees' Representation Plan. He spoke of the rumors that Amalgamated was organizing, asked the men if they knew anything about it, and finally said to Cook "Do you know anything about this?" Cook replied that he was president and that the members included 75 or 80 per cent of the employees in the plant. Swab stated "that it did not make sense to him why men should want to pay dues for the right to work" and he inquired as to why "we should have outsiders coming in telling us what to do." Cook then volunteered that the men would not be satisfied with the Representation Plan and Swab said, "If this business is not stopped, somebody is going to be asked to take a vacation." As he was looking to Cook, the latter remarked, "I presume that's me." Swab said nothing further.

Petitioner finally granted Amalgamated a conference on or about March 18, 1937. Three meetings were held without accomplishment of tangible results and Amalgamated, on May 30, 1937, called a strike, claiming that it could not obtain an agreement from petitioner. This strike lasted until July, 1937. During its existence Amalgamated met with petitioner, each of them trying to settle the controversy. Petitioner through its officers and agents urged employees to ignore Amalgamated. Some of the members were threatened by foremen with loss of employment if they did not comply. Superintendent Shank advised the men to return to work, saying that many of the members of Amalgamated would be rejected as employees for physical reasons after examination by petitioner's physician. On June 6, 1937, Swab received a committee of Independent, who reported that the latter then represented a majority of the employees, all of whom were willing to return to work on the conditions existing before the strike. All these acts, the Board found, were part of a course of action designed to deprive its employees of the right to self-organization, and calculated to and did intimidate them in their organization work.

The strike terminated July 9, 1937. A few days later Cook, president of Amalgamated, found that his free day had been

changed from Sunday to Tuesday. Cook, having seniority, had been allowed Sundays off for four years prior to the strike. He inquired of Foreman McCracken as to the reason, and the latter answered "Well, it was because you fellows run me off the picket line during the strike. That is why I did it and it is going to stand like that." McCracken said, "It doesn't come from me and it doesn't come from Shank, it comes from the higher office." Cook protested to Shank and a few days later, Foreman Pickering advised him in reference to the argument, that the matter would have to stand as it was "because you fellows are so strong in number."

Krafcisin, another employee, was asked by Foreman Butler if the C. I. O. did not hurt him. Krafcisin replied that he intended to remain in the union. The foreman then sent him home but that night went to Krafcisin's house and told him to return to work. Foreman Wolff approached another employee and told him that the C. I. O. was dead, and asked him who "poisoned his mind." Swab said, "Those fellows from the outside walked in and organized here * * * we could have our home here as one family." In March, 1938, Foreman McCracken said to Brebrich, a welder, "The C. I. O. is causing a lot of the 'slowing down of our manufacturing mills.'" He continued, in reference to another plant in Chicago Heights, "When they signed the C. I. O. contract the plant shut down." Gaden, the safety supervisor, said that the C. I. O. "has got a lot to do with slowing down things." He said to Krafcisin, "Well, look, in here, in this place, the C. I. O. and another inside union here." Krafcisin said, "Well I believe men should organize, I believe in organization." And Gaden said, "Why don't they organize like they used to years ago, inside, join the one inside union here in the plant as it used to be."

In July, 1938, McCracken said to Cook, "You have been messing in my business. If you want to stay you have got to keep your mouth out of my business; many's the time I saved your job in the past 18 months; many a fuss I had with Swab about you." When Cook protested that he had done nothing to cause any fuss, McCracken said, "You know what you have done and you know what I am referring to." Cook replied that the only thing that he could imagine that Swab could have against him was that he had organized a

union, and McCracken replied, "That is exactly it, and it will take a long time for that to get out from under my skin. We know everything that is going on in these union meetings. No outsiders are coming in to tell us how to run the plant. If you want to stay, you had better keep your mouth shut. If you want to go back to work under those terms, go ahead."

█ The foregoing is by no means a complete statement of the evidence relied upon by the Board in making its findings upon this branch of the proceeding, but it is illustrative of and includes substantial portions thereof. The evidence was disputed. The Board referred at considerable length to the testimony of Mr. Swab and of petitioner's subordinate officers and employees, who controverted sharply the testimony of the employees who made the complaints, and commented that the examiner saw the witnesses, was the judge of their credibility and, upon examination of the record, had found the facts, declaring disbelief of the testimony of certain specified witnesses. Cook undoubtedly was a witness friendly to the charges and perhaps the other employees who testified in support of them, being members of the Amalgamated, were equally interested and partial. But it is clearly beyond our province to say that their partiality was of such character that the examiner and the Board were bound to disbelieve them. Some of them were illiterate and unfamiliar with the English language. The testimony exhibits difficulty in clear expression. But it is not for a court of review to say that their stories as to what transpired must be disbelieved because of these circumstances. The officers and employees of the company were intelligent men and repeatedly disclosed their superiority in their testimony. If we were the triers of the fact we would have the right to entertain an appeal to accept their statements rather than those of witnesses contradicting them. But the reasons why the examiner and the Board concluded that they should credit the testimony of Cook and his associates and not that of petitioner's officials and subsidiary representatives are fully stated and we are powerless to say, as a matter of law, that the circumstances which led to the extension of credibility on the one hand and to its denial on the other, were, as a matter of law, such that one group must be believed to the exclusion of the other.

■ The act was intended to secure and preserve for employees the right to bargain collectively without intimidation, coercion or other improper influence from anybody, whether it be employer, labor unions or others. The purpose of the legislation and its proper administration necessitate, upon the part of the employer, the utmost of honest neutrality upon his part. It imposes upon him the duty to realize that his employees are free agents and that he must stand as a neutral party, accepting without reservation their selection of bargaining agent. This neutrality is akin to that of the examiner, the Board and the court. It is not for the Board or the courts to take into their hands the decision of which is the best union for the employees. The whole purpose is to impose upon the employer, the Board and the court, utter neutrality and impartiality. The whole end in view is free, untrammeled, uninfluenced self-determination of a bargaining agent. We must assume that the members of the administrative body appreciated the necessity of such an attitude upon their part and acted upon the conviction that the facts and circumstances prevented that ideal situation contemplated by the legislation, namely: untrammeled self-determination by the employees. They evidently believed that the circumstances were such as to disclose that the employer was prejudiced against one of the unions and favorable to the other; that it made its partisanship known to its employees and that its acts and statements in that respect were such as to interfere with free self-determination by the employees. Inasmuch as there was evidence to support this conclusion, irrespective of what other men might have concluded, this court is powerless to nullify the reasonable acts of the administrative body created to carry out the purposes of the legislation. We may interfere only where it is apparent the action complained of is arbitrary and unsupported by substantial evidence,— where there is abuse of discretion. National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815, 819; Pittsburg Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698–701; National Labor Relations Board v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753 (Dec. 12, 1940).

*Refusal To Bargain Collectively*: On March 23, 1938, the Board in a proper proceedings certified, after an election, Amalgamated as the selected bargaining agent for the employees. No plea for rescission or vacation of this certification has been presented to the Board. It found that up to August 19, 1938, and at all times thereafter, petitioner refused to bargain collectively with Amalgamated. Petitioner argues zealously that the record shows affirmatively that there was constant bargaining and that there was no refusal to bargain. The respondent argues equally zealously that there were negotiations but that there was never recognition of Amalgamated or bargaining as contemplated by the act.

The evidence is that for several months, meetings between Amalgamated and the company representatives occurred, there being eight such conferences. Proposals and counterproposals were made; no final agreement was consummated. Finally on August 19, 1938, petitioner advised Amalgamated that it had a petition from its rival, the Independent, signed by a majority of its employees and that consequently it could not recognize Amalgamated as the exclusive bargaining agent, even though so certified by the Board, and that it was then meeting with Amalgamated as representative of its members only.

■ We consider it unnecessary to discuss at any length the evidence as to what transpired in the period from April to August between Amalgamated and petitioner for, even if we should be convinced that there was no refusal to bargain prior to August 19, on that date, obviously, there was refusal. In pursuance of an election, the Board had certified Amalgamated as the duly designated exclusive bargaining agent for the employees. This certification remained in full force and effect and petitioner, by its own statement, at that time refused to bargain with Amalgamated in the manner and in the relation required by the certification and the act. As we read the statute, in the Board is lodged jurisdiction to determine in a proper manner the unit appropriate for the purpose of collective bargaining. Congress conferred exclusive jurisdiction upon the Board to determine the appropriate and selective bargaining unit for employees and gave to it alone proper machinery by way of election for making such determination. Employees have the right to designate their bargaining agent. The Board alone may certify the selection and we take it that so

long as that certification remains in full force and effect, the organization designated must be recognized. The employer must accord to a certified agent recognition as the proper bargaining agent until the certification is rescinded or succeeded by another. Any other holding would upset orderly procedure and destroy the efficiency of determination by the body authorized to act and maintain the proceedings in a state of suspension and indecision. International Association of Machinists v. National Labor Relations Board, 71 App. D.C. 175, 110 F.2d 29; see also National Labor Relations Board v. Remington-Rand Inc., 2 Cir., 94 F.2d 862, 870, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540.

In the recent case of International Association of Machinists, Tool and Die Makers Lodge No. 35, etc., Petitioners v. National Labor Relations Board, 61 S.Ct. 83, 89, 85 L.Ed. ——, November 12, 1940, the court discussed the effect of an alleged change in status. There the petitioner challenged the order directing the employer to bargain exclusively with one union on the ground that in the meantime, petitioner had obtained an overwhelming majority of the production employees and had so notified the Board. It contended that the Board, on receipt of the notification of that fact, should have treated petitioner as the proper bargaining agent or at least have made an investigation. But Mr. Justice Douglas said:

"We agree with the court below that the Board in failing to act on this request did not commit error. This was not a certification proceeding under § 9(c) [29 U.S.C. A. § 159(c)]; it was an unfair labor practice proceeding under § 10 [section 160]. Where as a result of unfair labor practices a union cannot be said to represent an uncoerced majority, the Board has the power to take appropriate steps to the end that the effect of those practices will be dissipated. That necessarily involves an exercise of discretion on the part of the Board—discretion involving an expert judgment as to ways and means of protecting the freedom of choice guaranteed to the employees by the Act. It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 311, 84 L.Ed. 396. It cannot be assumed that an unremedied refusal of an employer to bargain collectively with an appropriate labor organization has no effect on the development of collective bargaining. See National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 275, 58 S.Ct. 577, 578, 82 L.Ed. 838. Nor is the conclusion unjustified that unless the effect of the unfair labor practices is completely dissipated, the employees might still be subject to improper restraints and not have the complete freedom of choice which the Act contemplates. Hence the failure of the Board to recognize petitioner's notice of change was wholly proper. National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 339, 340, 60 S.Ct. 918, 929, 84 L.Ed. 1226.

"Sec. 9 of the Act provides adequate machinery for determining in certification proceedings questions of representation after unfair labor practices have been removed as obstacles to the employees' full freedom of choice."

■ So here there was an orderly method of procedure by which the intervener could have presented its claim for recognition as bargaining agent before the Board. That remedy is always open to it. It cannot be deprived of its right to apply for and have a hearing before the Board; but until there has been such an application and resulting modification of the finding and decision of the Board as to the proper bargaining agent, the certification must stand.

Consequently when the petitioner refused to bargain with Amalgamated as the exclusive bargaining agent of its employees, as had been certified by the Board, by its own admission, it became guilty of refusal to bargain.

What we have said in this respect, however, is not intended to estop in any way the right of petitioner or of the intervener to seek a rehearing upon the question of certification and to present any proper evidence of an alleged change in the status proper to be considered by the Board. Almost four years have elapsed since the list of employees from which the election was conducted was compiled and almost three years since the date of the election. Obviously the personnel of employees and equally obviously the attitude of employees toward two or more unions may change

substantially in the course of such a period. It may well be that upon a new election the intervener or the petitioner may be able to satisfy the Board that the former certification should be cancelled and a new one entered. At any rate this decision shall be wholly without prejudice to the rights of any interested proper party to seek the designation of another bargaining agent.

 *Domination Of and Interference With the Formation and Administration of the Independent:* It appears without dispute that certain employees of petitioner, without suggestion upon the part of petitioner, consulted an attorney in no wise connected with petitioner, had prepared a constitution and by-laws for the Independent and secured a corporate charter therefor. There is no evidence in the record indicating that this action was at the suggestion of petitioner or any of its representatives. The Board, however, was of the opinion, as was the examiner, that the statements of various persons connected with the company from time to time indicated clearly a preference for an independent union and that the effect of such indication was to inspire in the employees a feeling that because of such preference on the part of their employer, it was preferable for them to have an independent union. There was testimony that Mr. Swab said, after the decision of the Supreme Court in the Jones-Laughlin case, "We can't meet with you fellows any more as a management group. I don't see any reason why that you fellows can't continue to meet with your own little organization as you are," and "It's entirely the choice of the men in the plant whether they will be represented by someone in the plant, or by an outsider. How you will best be served and under what system you are rests with you. We will judge the future by the past, and trust that the future will be the same as in the past." There was testimony that he also said at the same meeting that "It didn't make sense to him why men should want to pay, have to pay dues to work, for the right to work, and why we should have outsiders coming in telling us what to do." Swab denied these statements but the Board believed the testimony to the effect that he made them and we have no right to say otherwise. Inasmuch as the Board, therefore, has found that the statements were made, it was only a reasonable inference that they indicated a desire upon the part of Mr. Swab as head of petitioner's organization that the relationship should be as in the past and with an organization of similar character. He had a perfect right to express his preference, but if that preference was of such character as to take from his employees their untrammeled freedom of action in selecting their bargaining agent, the Board might rightfully say that this was interference forbidden by the act. Expressions of opinion by an employer concerning unions may come within the enjoyment of his constitutional rights, but if they destroy the neutrality invoked by Congress, they are competent evidence of violation of the act. National Labor Relations Board v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753 (Dec. 12, 1940). Individual rights must fall if their exercise interferes with the legitimate exercise of the police power.

After the charter was procured, a committee of the Independent under police protection passed into the plant while the strike was in progress and negotiated with Swab, telling him that they represented a majority of the employees and that they were willing to return to work. Petitioner thereupon issued a statement of policy which provided for individual bargaining and recognition of the Amalgamated as representative for its members only. It did not formally recognize Independent.

 There was testimony in addition that in February, 1938, a foreman said to one witness, just before the election "Don't vote for the C. I. O.,—vote for the company." The Board relates certain other testimony upon which it relied, as a result of all of which it concluded that petitioner had dominated and interfered with the formation and administration of and contributed support to the Independent and thereby interfered with, restrained and coerced its employees. The evidence in support of this finding is weak. There is much persuasive evidence that petitioner, so far as its executive officers were concerned, attempted to preserve the neutrality fostered by the act. But we cannot say that the record is devoid of substantial evidence that petitioner openly disclosed its sympathy for an independent union; intimated freely its desire to exclude "outside" unions; resented payment of dues by its employees to such a union and hoped for and desired a continuation of conditions and relationship existing in the past.

Petitioner's acts may have been in the best of good faith but they were an abrogation of that ideal neutrality aimed at in the act. It is not for us to assert wisdom or lack of wisdom in legislative policy, which, as expressed in the statute, forbids a beneficent fraternalism or paternalism in the relations of employer and employee. It is not for us to declare the latter theory of relationship preferable to one in which the employer and employee must need stand at arm's length. Which social policy will encourage peace in labor conditions and which will promote strife are questions far beyond the proper purview of our determination. We find in the record substantial evidence, which if believed by the Board, as it was, could lead only to the inferences the Board drew with respect to the attitude of petitioner toward the two unions.

■■■■■ Petitioner complains that the denial of its motion to make the complaint more definite and certain deprived it of due process of law. When the motion was denied, the examiner ruled that the petitioner, if surprised by any testimony as result of the denial of the motion, would be given opportunity to protect itself. Obviously the right to a hearing embraces not only the right to present evidence but also reasonable opportunity to learn the claims of the opposing party and to meet them. Morgan v. United States, 304 U.S. 1, 58 S. Ct. 773, 999, 82 L.Ed. 1129. But we have observed in the record nothing to indicate anything produced against petitioner of which it did not have reasonable notice. Nothing has been pointed out that would indicate that it was at any time taken by surprise or that any disadvantage, harm or injury accrued because of generality in any of the specifications. The detailed charges of the third amended complaint were, we think, full and sufficient notice to the petitioner of all charges made and nothing transpired which in any way impaired the rights of petitioner. National Licorice Co. v. Labor Board, 309 U.S. 350–369, 60 S.Ct. 569, 84 L.Ed. 799.

Petitioner complains also that the Board attributed to subordinate employees the power and capacity to bind the company. Everything said in support of this contention is fully answered by International Association of Machinists, etc., v. National Labor Relations Board, supra, where in discussing acts of men "more or less assistant foremen" the court said:

"Petitioner attacks the Board's conclusion that its membership drive was headed by 'supervisory' employees—Fouts, Shock, Dininger and Bolander. According to petitioner these men were not foremen, let alone supervisors entrusted with executive or directorial functions, but merely 'lead men' who by reason of long experience were skilled in handling new jobs and hence directed the set-up of the work. Petitioner's argument is that since these men were not supervisory their acts of solicitation were not coercive and not attributable to the employer.

"The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of respondeat superior. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates. Here there was ample evidence to support that inference. As we have said, Fouts, Shock, Dininger and Bolander all had men working under them. To be sure, they were not high in the factory hierarchy and apparently did not have the power to hire or to fire. But they did exercise general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management. It is clear that they did exactly that. Moreover, three of them—Fouts, Shock and Bolander—had been actively engaged during the preceding weeks in promoting the company union. During the membership drive for petitioner they stressed the fact that the employer

would prefer those who joined petitioner to those who joined U. A. W. They spread the idea that the purpose in establishing petitioner was 'to beat the C. I. O.' and that the employees might withdraw from the petitioner once this objective was reached. And in doing these things they were emulating the example set by the management."

Subject to what we have said concerning the right of parties to seek a recertification and redetermination of the bargaining agent, the order of the Board must be enforced.