## NATIONAL LABOR RELATIONS BOARD v. CLARKSBURG PUB. CO.

### No. 4772.

Circuit Court of Appeals, Fourth Circuit.

June 10, 1941.

NORTHCOTT, Circuit Judge, dissenting in part.

———◆———

David Findling, of Washington, D. C., Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Richard C. Barrett, and Ralph Winkler, all of Washington, D. C., Attys., National Labor Relations Board, on the brief) for petitioner.

John S. Stump, Jr. of Clarksburg, W. Va. (Charles W. Louchery, of Clarksburg, W. Va., on the brief), for respondent.

Before PARKER, SOPER, and NORTHCOTT, Circuit Judges.

SOPER, Circuit Judge.

The National Labor Relations Board petitions the court for enforcement of an order against the Clarksburg Publishing Company, whereby the Publishing Company was directed (1) to cease and desist from certain unfair labor practices; (2) to bargain collectively with the Newspaper Guild of Clarksburg Local No. 118, a labor organization, and (3) to offer reinstatement and back pay to one Helen Post, a discharged employee. The order is based on findings and conclusions of the Board that the company, through its officials, in violation of Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), had interfered with, restrained and coerced its employees from exercising their right to join and support the Guild; that the company had refused to bargain collectively with the Guild in violation of Section 8(1) and (5) of the Act; and that the company had discharged Helen Post because of her union membership and activities in violation of Section 8(3) of the Act.

The respondent challenges the validity of the order on the ground that the Board's findings were without substantial evidence to support them. The Clarksburg Publishing Company, a West Virginia corporation, publishes three newspapers in the town of Clarksburg: "The Clarksburg Exponent", a morning Democratic paper, "The Clarksburg Telegram", an evening Republican paper; and the "Sunday Exponent-Telegram", a nonpartisan Sunday paper. The Publishing Company was organized in 1927 as the result of a merger between the Exponent Company and the Telegram Company, which was accomplished through the medium of a voting trust. Under the trust agreement the stock of the two papers is held by two voting trustees, John A. Kennedy and Cecil B. Highland. Management of the corporation is vested in six directors, three of whom, called Class A directors, are elected by the former stockholders of the Telegram Company, and three of whom, known as Class B directors, are elected by the former stockholders of the Exponent. The three Class A directors, Highland, his wife and Anthony McCue, have control of the editorial policies of the Telegram. The three Class B directors, Kennedy, Mrs. Gertrude M. Highland, and W. Guy Tetrick, exercise control over the editorial policies of the Exponent. The nonpartisan Sunday Exponent-Telegram is a jointly controlled proposition, though as a practical matter it is mainly produced through the efforts of the Exponent's editorial staff.

All three papers are published upon the same printing press. The personnel of the editorial staffs of the Telegram and the Exponent are separate and distinct, but they work in the same offices and use the same desks and equipment, the Telegram staff using the facilities from 7 A. M. to 3 P. M. each day, and the Exponent staff coming to work after that.

Under the by-laws of the Publishing Company, four directors are necessary for a quorum at any meeting, and a majority vote of four directors is necessary for corporate action. Likewise under the by-laws, the directors have the sole authority to fix the terms and conditions of employment and to hire and fire employees. However, in order to facilitate matters, there was a gentleman's agreement between Highland, who controlled the destinies of the Telegram, and Kennedy, who was the leader of the Class B stockholders, that each would grant the wishes of the other, within reasonable limits, in routine matters concerning the employment and discharge of employees on their respective editorial staffs.

Highland and Kennedy served as president and vice president respectively of the respondent during the period under examination. During this period the company employed approximately 160 persons, exclusive of circulation people. Of this number 18 were editorial employees, evenly divided between the Exponent and the Telegram. The present controversy arose out of the company's relation with the Guild, which was organized in May, 1937, by some of the editorial employees under the leadership of Frank Carpenter, the Telegram's police reporter. During the first year of its existence the members of the Guild made no public mention of the organization, but trouble arose in December, 1938, when the Guild sought to establish itself as a bargaining agent of the editorial employees. By the spring of 1939 it was evident that the Guild's efforts to secure recognition had been fruitless, and charges were accordingly filed against the Publishing Company which have culminated in the instant case.

The substantial character of the evidence found credible by the Board is shown by the following recital: Highland, who controlled the policies of the Telegram, was openly hostile to the Guild. On numerous occasions he told employees of the Telegram

that membership in the Guild was inconsistent with loyalty to the paper and to him. Leo King, city editor of the Telegram, was quoted as saying that Highland had threatened to demote him to a reporter unless he resigned from the Guild, and he was worried about his job.

Highland told Art Wright, a member of the Telegram's editorial staff, and King that he didn't intend to bargain with the Guild; that he had lots of applications for jobs from college graduates and that if they continued with "this Guild idea", they "had better look for another job". Gene Collett, another of the employees of the Telegram, visited Highland's office on April 3, 1939, as a member of the committee of the Guild to procure conferences with that body. Highland advised them that he was opposed to meeting with the Guild. He then admonished them that if matters were ever brought to a hearing before the Board, no one who was not loyal to him would be working on the paper.

Wilbur Swiger, editor-in-chief of the Telegram until his death in April, 1939, questioned Welch, sports editor for the Telegram, when the latter was applying for employment, as to how he felt about the C. I. O. On being told that Welch didn't think much of that organization he said that he was glad to know it because he knew that Mr. Highland felt the same way about it. There was testimony that Highland had instructed Swiger to talk to members of the editorial staff about the Guild and Swiger told Wright that it wasn't healthy for his job to be lined up with the Guild.

Carpenter, the Telegram's police reporter, was Highland's right hand man after Swiger became sick around Thanksgiving, 1938, and became hostile to the Guild, the formation of which being largely the result of his efforts, he being its first president; but he resigned from the Guild in August, 1938, and stated that from that time on he was out to get the Guild. King testified that several times prior to Carpenter's resignation from the Guild Carpenter suggested that "they sell out the Guild" for their own profit. Carpenter testified that he gave Highland all the information he had concerning the Guild in March, 1939. Wright testified that Carpenter was giving information to Highland about the Guild and was receiving extra money for this service.

After receiving a letter from the Guild on December 6, 1938, requesting that negotiations be opened, Highland intensified his efforts to break up the organization. Working in conjunction with Carpenter, he procured the resignations of King and Welch. These letters of resignation were dated December 29, 1938. Wright testified that on the afternoon of December 31, 1938, he went to Highland's office at Carpenter's request and found Highland and Carpenter there. They showed him carbon copies of the resignations of King and Welch, and produced a letter of resignation for Wright to sign. When he refused, Highland became angry and told him he was fired. However, he reported for work as usual and apparently nothing more was said of the incident.

■ The evidence above summarized is not uncontradicted, but it was credited by the Board and certainly affords substantial ground for its conclusion that the employees were restrained in the exercise of their right to join the labor organization. It cannot be disputed that the respondent corporation is responsible under the Act for the conduct and utterances of Highland who served as its president. Moreover, Swiger and Carpenter were certainly supervisory employees, and while they did not have the right to hire and fire, their position was such that their fellow employees would have just cause to believe that they represented the management. The Board was justified in concluding that the employees did not have the complete and unhampered freedom of choice contemplated by the Act. International Ass'n of Machinists v. Labor Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. ——; Labor Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951; Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. ——.

■ The respondents seek to avoid the consequences of the conduct of these men on the ground that they were merely exercising their rights of free speech. Some latitude in the discussion of labor matters must be conceded to an employer. He may express an opinion if it carries no threat of discrimination and does not interfere with the attempts of his employees to organize. Midland Steel Products Co. v. Labor Board, 6 Cir., 113 F.2d 800, 804. But expressions of opinion by management, whether written or spoken, which are intended to discourage and in fact do discourage union activity, are a plain violation of the Act. International Ass'n of Machinists v. Labor Board, 311 U.S. 72, 78, 61 S.Ct. 83, 85 L. Ed. ——; Labor Board v. Link-Belt Co.,

311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. ——; Labor Board v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288; Labor Board v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753, 756. The propriety of the Board's order on this phase is beyond doubt.

■ On the second branch of the case, the company concedes that it refused to bargain collectively with a committee of the Guild as the representative of the editorial employees. The only response to an application of the Guild for a conference was a request for certain information about the Guild and the number of its members. Fruitless efforts to secure a conference began in December, 1938, and lasted until April, 1939, when a committee of the Guild called on Highland and promised to give him the information if he assured them that he would enter into negotiations with the union. Highland declined, stating that he was opposed to a meeting with the Guild. The company contends that its action in this respect should be excused on the grounds (1) that the Guild offered no "reasonable proof" that it represented a majority of the editorial employees, and (2) that the unit represented by the Guild was inappropriate for the purposes of collective bargaining in view of the peculiar character of the company's business. Neither of these defenses is tenable. The evidence indicates and the Board found that the Guild represented a majority of the editorial employees; and it is obvious that the refusal of the company, acting through Highland, to bargain with the Guild was not due to any doubt as to the number of employees in the union, but was due to a positive rejection by the company of the principle of collective bargaining. Where the real attitude of an employer is that he will not bargain collectively with his employees under any conditions, he cannot excuse himself on the ground that sufficient proof of a majority status was not furnished him. Labor Board v. Remington Rand Inc., 2 Cir., 94 F.2d 862, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 85 L.Ed. 1540; Labor Board v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 18, 22. This holding applies with equal force to the second excuse of the company that the Guild constituted an inappropriate unit for bargaining purposes.

■ Moreover, the Board found that the editorial employees of the Clarksburg Publishing Company, including proofreaders and copyholders, but excluding editors-in-chief, constituted a unit appropriate for the purposes of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment. Subsection 9(b) of the Act, 29 U.S.C.A. § 159(b) gives the Board power to determine the appropriate group of employees for the bargaining unit; and a decision of the Board as to the appropriate unit cannot be disturbed unless the Board exercises the power conferred on it in an arbitrary and unreasonable manner. Pittsburgh Plate Glass Co. v. National Labor Relations Board, April 28, 1941, 61 S.Ct. 908, 85 L.Ed. ——; National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, certiorari denied 61 S.Ct. 447, 85 L.Ed. ——, rehearing denied 61 S.Ct. 619, 85 L.Ed. ——.

■ In the instant case the respondents contend that the Board has abused its power. They argue that since the Telegram is Republican and the Exponent is Democratic, it will affect the traditional policies of these two organs of public opinion and destroy their independence if the editorial employees of both are organized as a single unit. They therefore contend that the editorial employees of each paper should be organized in a separate unit. There is testimony in the record to support this contention, and one member of the Board thought that such an arrangement was the proper one. However, there is also ample evidence to support a contrary conclusion. Both papers are produced under the unified managerial control of one board of directors who have sole power to hire and fire, and to regulate wages and other conditions of employment. The same equipment is used by all editorial employees and the labor problems confronting both staffs are essentially the same. The typographical employees of the Publishing Company are organized as a single unit although it is true that they are divided into a Telegram chapel and an Exponent chapel, each of which handles its own grievances. In addition, Highland admitted that so far as he knew, the organization of the Guild had not affected the Telegram. On this state of the facts it cannot be said that the Board acted arbitrarily or abused its power. Although reasonable men may differ as to the correct solution, the Board's decision must stand as it is supported by substantial evidence. Pittsburgh Plate Glass Co. v. National Labor Relations Board, supra; Labor Relations Board v. Piqua Munising W. Prod.

Co., 6 Cir., 109 F.2d 552; Bussmann Mfg. Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 783.

We think also that there was sufficient evidence to sustain the finding of the Board that Helen Post, assistant proofreader or copyreader on the Telegram, was discharged and refused reinstatement because of her union membership and activity. Miss Post began to work for the respondent Publishing Company on November 19, 1936. She joined the Guild on August 16, 1937 at the solicitation of Carpenter, and was a member at the time of her discharge. Although she was not a leading light in that organization, she attended all the meetings, paid her dues, and did what she could to further its aims. Towards the close of 1938 Highland complimented her on her work and told her that she would probably receive a present after the first of the year. The first week in January, 1939 Post's salary was raised from $14 to $16.50 a week. She was discharged about a month later, on February 7, 1939, when without prior warning or explanation, she received a letter from Powell, business manager of the paper, informing her that her services were no longer needed. She went to see him to find out the reason for the company's action. He told her that he did not know anything about the letter, and that he would be glad to give her a letter of recommendation. She also interviewed Highland relative to this matter. Apparently she was given no definite reason as to why she was discharged. Highland told her that everybody has his own reasons for doing things and does not always give these out; and that it made him feel bad when people held meetings and said things against him; Highland gave her some advice telling her the next time she got a job to mind her own business and not to get mixed up in other people's affairs. About four days after Post's discharge, Highland caused a notice to be posted in the editorial office of the Publishing Company warning employees that no conferences should be held in the editorial department or in the composing room during working hours, and commanding employees to discuss labor problems outside of the offices. About a week or so after Post's discharge, the Guild unsuccessfully sought to hold a conference with Highland on the subject. On April 3, 1939, Highland told a committee of the Guild that Post was incompetent and that there was a complaint that she was running out into the composing room to talk to the linotype operators and was creating a disturbance in the office. The record shows that the directors voted for Post's discharge after Highland told them that he desired to replace her because she was inefficient. Kennedy had previously promised Garrett, president of the Guild, that he would not permit the discharge of any Guild members on account of their union membership. He testified that he did not know Post was a member of the Guild, and that in voting for her discharge he was merely carrying out his gentleman's agreement with Highland as to hiring and firing employees.

The respondents contend that Post was discharged for inefficiency and because her desk was a focal point of disturbance in the office. The testimony of Highland and Carpenter support this contention. Highland stated that he did not know that Post was a member of the Guild when he urged the directors to discharge her. But Carpenter knew that Post was a union member; and as Carpenter, prior to her discharge, had resigned from the Guild and had become Highland's right hand man and had assisted him in securing resignations from the Guild, the Board found that Highland had knowledge of Post's membership in the Guild. However, there was no testimony of specific instances of inefficiency on Post's part except for one mistake which occurred five months before she was fired and for which no blame was attached to her at the time. On the other hand, there was a good deal of testimony by Post's fellow employees, including her superior, Miss Hindman, proofreader for the Telegram, that Post was a good worker, a quiet conscientious girl and was more competent than the person who replaced her. Respondents also claim that the fact that Post's salary was raised does not indicate she was doing a good job. Highland testified that her wage increase was due to the fact that Kennedy raised the salary of the proofreader on the Exponent $2.50. But it should be noted that the salary of that employee was $31 a week as compared to Post's $16.50 and Miss Hindman's $22.50. Highland also thought Miss Hindman incompetent, but she was not discharged.

The decision of the Board on this issue is not entirely free from doubt. The Act does not confer managerial powers upon the Board, and it can only order rein-

statement when an employee is discharged for union membership or activities, in order to encourage or discourage membership in a labor organization. Labor Board v. Jones & Laughlin Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Labor Board v. Union Pacific Stages, 9 Cir., 99 F.2d 153; Jefferson Electric Co. v. Labor Board, 7 Cir., 102 F.2d 949. Consequently the company was within its rights in discharging Post if, in the opinion of its president, she was inefficient, although the opinion was mistakenly held. But there are circumstances in this case from which the inference may fairly be drawn that the reason given for the discharge was a pretext to conceal the illegality involved in a discharge because of union membership; and it is for the Board, and not for this court, to draw the inferences from facts upon which the order of the Board is based. Labor Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. ——; Valley Mould & Iron Corp. v. Labor Board, 7 Cir., 116 F. 2d 760. See also the opinion of this court filed this day in Labor Board v. Blue Bell-Globe Mfg. Co., 4 Cir., 120 F.2d 974. Considering Highland's opposition to the union, his activities to reduce the Guild's membership, the notice posted shortly after the discharge forbidding employees to discuss labor problems within the office and the strong testimony that the employee was an efficient worker, we cannot say that there is not substantial evidence to support the inference drawn by the Board that Post was discharged because of her union membership.

Paragraph 2(b) of the Board's order directs the respondents to offer reinstatement to Helen Post with back pay from February 18, 1939, less amounts earned during that period, and to pay over amounts earned from Federal, State, County, Municipal, or other work-relief projects to the agency supplying such work. The Board requests and consents that its order be modified to conform with the decision of the Supreme Court in Republic Steel Corp. v. Labor Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——. Accordingly the phrase: "and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects" will be stricken from the order. With this modification the Board's order will be affirmed.

Modified and Affirmed.

NORTHCOTT, Circuit Judge, dissents from that part of the opinion dealing with the discharge of Helen Post.