## NATIONAL LABOR RELATIONS BOARD v. HOLLYWOOD–MAXWELL CO.

### No. 9731.

Circuit Court of Appeals, Ninth Circuit.
March 23, 1942.

Robert B. Watts, Gen. Counsel, National Labor Relations Board, Ernest A. Gross, Associate Gen. Counsel, Frederick M. Davenport, Jr., and Margaret Holmes McDowell, Attys., National Labor Relations Board, all of Washington, D. C., and Richard A. Perkins, Atty., National Labor Relations Board, of Los Angeles, Cal., for petitioner National Labor Relations Board.

Latham & Watkins and Richard Lund, all of Los Angeles, Cal., for respondent Hollywood-Maxwell Co.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of its order issued against respondent pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C. Supp. V, Sec. 151 et seq., 29 U.S.C.A. § 151 et seq.

The jurisdiction of this court is based upon Section 10(e) of the Act. Respondent is a California corporation having its principal place of business in Los Angeles, California, where the claimed unfair labor practices occurred. It was engaged in the manufacture and the interstate shipment and sale of brassieres and bust forms. The jurisdictional facts of the interstate commerce into which flows the product of the laborers' efforts are proved.

We are asked to decree against respondent (a) a general cease and desist order, the Board having found respondent to have successively bribed one William Busick, a general organizer of the International Ladies Garment Workers Union, at all pertinent times one of the unions of the Congress of Industrial Organizations, who organized some of respondent's workers into a local, No. 236, hereafter called the C. I. O. Union, and also to have urged and aided certain of its employees to create a union of their own; (b) that respondent had violated Section 8(5) of the National Labor Relations Act in refusing to bargain collectively with the C. I. O. Union on March 14, 1939, some three weeks after the discovery of the bribery and the then attempted revocation by enough of the employees of their designation of the C. I. O. Union as their bargaining agent to reduce the remaining designations to much less than half the employees; (c) that respondent must negotiate with the C. I. O. Union as the bargaining agent of a majority of the productive employees of respondent; (d) that a union called the Independent Productive Group, hereinafter called the Group, formed by an admitted majority of respondent's employees after the discovery of the bribery, and prior to March 14, 1939, was dominated and controlled by the respondent and hence should be disestablished and a contract made by the Group with the respondent should be set aside; (e) that a corporation formed by respondent's employees, the Independent Brassiere Workers of California, hereinafter called the Brassiere Workers, had been interfered with by respondent's aid in its formation in September 1937 in violation of Section 8(1) of the National Labor Relations Act, and that it had, in addition, dominated the corporation subsequent to its formation and, therefore, the corporation should be disestablished.

(A) *The laborers and their choice of rights to form or join labor organizations.*

■ The enterprise of respondent is a relatively small manufacturing unit of garment workers, mostly women. It is the rights of self-organization of these workers, either (a) to "form" a union to aid them in collective bargaining or (b) to "join" one already formed for that purpose, with which this proceeding is primarily concerned. The protection of these rights, described in Sections 1[1] and 7[2] of the

---

[1] Sec. 1. "* * * It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

[2] Sec. 7. "Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted ac-

National Labor Relations Act, is the major, if not the sole, purpose of Congress in enacting that legislation to free the flow of interstate commerce from the interference of industrial disputes.

Respondent had a president who was also general manager, a foreman, forelady, and supervising inspector, and other non-garment workers or those in a supervisory capacity. The time involved is from July 1937 to June 1939, when the Board served its complaint on the respondent and the three labor organizations involved.

The period began in the early confusion in the minds of workers and employers alike concerning their respective rights and obligations under the National Labor Relations Act, the Jones and Laughlin decision, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, having become final in the preceding May. From the beginning, up to March 1939, the garment workers were closely divided on the question whether they would form a union of their own or join the C. I. O. Union. There were the usual two or three vibrant personalities leading each group of workers, personalities without whom the whole fabric of labor organization could not have been woven and without whom it never would have been created.

(B) *The respondent's bribery of William Busick, a grafting general C. I. O. labor organizer.*

The labor disputes between the two groups of workers and between them and the employer took form in July, August and September 1937 in a successful strike and organization of the employees by one William Busick. Busick was not an employee garment worker. He was a grafting general organizer of the C. I. O. Union. He was found by the Board secretly to have been bribed, and repeatedly bribed, by the respondent's president beginning shortly after Busick had won the strike and had procured an exclusive bargaining agency for the employees he betrayed in the C. I. O. Union. This exclusive agency extended for one year from October 1, 1937. The purpose of the bribery, which was repeated several times in 1938, was to have Busick persuade his union to have an election called by the Board at a time when it had less than the majority designations required by Section 9(a) of the National Labor Relations Act.

The respondent in August 1937, when Busick was working into his control of the employees, sided with the group which disliked the C. I. O. methods and was seeking to form its own union. Two of respondent's supervisory employees addressed the workers and encouraged them to exercise their congressionally recognized right to form their own union. One of them criticized the C. I. O. Union before an assembled group of the workers. He also contributed to the cost of a mimeographed argument for the forming of an independent union. The committee of workers for self-organization within the plant on one occasion conferred with Dr. Bowen, respondent's president, "during working hours without loss of time or pay," as expressly permitted by Section 8(2) of the Labor Act,[3] at which time the committee discussed their inside organization in connection with certain wage demands on the respondent. There were other meetings which Dr. Bowen walked in upon, but no further impropriety on the part of the respondent is shown—unless its advice that they should exercise their right, guaranteed by the statute, to form their own union by perfecting their organization be deemed an impropriety.

More pertinent to the Board's order disestablishing the California corporation, the Brassiere Workers union, which the workers created on September 7, 1937, shortly after these meetings, is that no act of domination or attempted domination over it was committed by the respondent. Nor was there any evidence of a voluntary submission by the Brassiere corporation or its members to any demand of the employer, much less any evidence of the making of such a demand.

It is doubtful that the encouragement of and aid to the workers seeking to form

---

tivities, for the purpose of collective bargaining or other mutual aid or protection."

. [3] The pay not lost by one worker is shown to be $2.00.

Sec. 8 "(2) To dominate or interfere with the formation or administration of any labor organization or contribute

financial or other support to it: **Provided,** That subject to rules and regulations made and published by the Board pursuant to section 6 (a) of this act [156 of this title], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay."

their own union, given by the respondent in July and August, 1937, which were then known to the Board, would in the absence of any interference or attempted interference or act of dominion in the succeeding year and eleven months, warrant a general cease and desist order against respondent on a hearing on a complaint dated June 26, 1939. However, there can be no question that such an order is required by respondent's continued bribing in the year 1938 of the grafting organizer.

This kind of crookedness by corporate managers in bribing the representatives of those having an interest in negotiations adverse to their corporation is as despicable as that of grafting labor leaders who secretly betray the inexperienced and innocent workers they persuade or coerce to join their unions. We are entitled to assume that the Board has taken up with the Department of Justice the question whether this conspiracy to violate a federal statute, enacted to accomplish the congressional function of regulating interstate commerce, is a conspiracy to obstruct the performance of a federal function within Section 37 of the Criminal Code, 18 U.S.C.A. § 88. Cf. Firth v. United States, 4 Cir., 253 F. 36.

We agree that, unlike in the case of National Labor Relations Board v. Mason Manufacturing Co., 9 Cir., 126 F.2d 810, decided February 13, 1942, there should be a general cease and desist order. Exercising our power under Section 10 of the Labor Act, we modify the Board's order to include a description of the dishonesty of the respondent and requiring respondent to cease and desist from

"Bribing any labor leader or organizer, or in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act."

We also require that respondent post immediately in at least four conspicuous places at its plant in the City of Los Angeles, and at all other plants it operates and maintains, for at least sixty (60) con-

secutive days from the date of posting, a copy of the above order and with it a statement that it will not engage in the conduct from which it is so ordered to cease and desist.

(C) *The laborers' revocation on March 1, 1939, after the disclosure of Busick's grafting, of the designations of the C. I. O. Union as bargaining agent, given in August 1937, during Busick's organizing campaign.*

The grafting of general organizer Busick was disclosed in late February 1939. Immediately thereafter many of the betrayed members concluded they had had enough of the C. I. O. Union and, on March 1, 1939, executed a revocation of their authorizations of that Union to bargain collectively for them, which they had given in writing some seventeen months before, when Busick had persuaded them to join it. In the same document they joined with others of the garment workers, not in forming a new organization but in merely *asking the assistance of the Board in later forming* such organization, describing themselves as then "unorganized."

This is evidenced by a writing signed by the designators of the C. I. O. Union and other garment workers, in all forty-four of the seventy-two so employed, held by the Board to constitute an appropriate unit for a labor organization. The pertinent part of the document so signed reads as follows:

"We now ask that The National Labor Relation's Board assist us so that we may have an organization where by as the majority of the productive employees of The Hollywood Maxwell Company, we can bargain collectively with the management for, better wages, hours and general conditions of employment.

"We revoke, disregard and withdraw absolute and completely any and all authorizations here to fore signed or directed by us to any other groups or unions, national or *independent*. We now place ourselves before The National Labor Relations Board as an unorganized and majority group, and ask that *it's* rights as accorded by law be now recognized."

It is not questioned that without these revoked designations the C. I. O. Union was not designated or selected as the bargaining agent of a majority of the garment workers. The Board had the burden of proof that the C. I. O. Union

was so organized that mere membership constituted it their designated bargaining agent. National Labor Relations Board v. Mason Manufacturing Co., supra. In determining whether there is support for the Board's finding that the C. I. O. Union was their agent for bargaining for working conditions, we cannot take judicial notice of a union's organization.[3a] Here the union's agency so to represent the garment workers rested solely upon these written designations given on or prior to September 1937.

After circulation of the document through the plant, it was sent on March 3 to the Board by registered mail. Neither its receipt nor its genuineness is questioned and the Board is therefore charged with knowledge of the revocations. It was some time after the presentation of this letter of revocation that these "unorganized" employees completed their organization called the Group. Thus we are concerned with the effectiveness of the revocations before the Group was formed. The Board held the revocations invalid and that, despite the discovery of the bribery of Busick, their designations of the C. I. O. Union which he had procured from them in August 1937 compelled them to continue to be represented by his union in March 1939 and thereafter. The Board's order compels their employer to deal only with that union.

We are unable to follow the mental processes by which the Board refused to recognize the revocations and seeks to compel the revokers to be represented by the discredited local of the C. I. O. Union. Congress makes it clear by Sections 1 and 7 of the Labor Act that the laborers' right to "form" their unions is equal to the right to "join" national unions. Also they have the right under Section 9(a) to designate a union they form themselves or a national union, as it best suits them. Obviously, this included the right to revoke a designation of a national union as their bargaining agent.

These garment workers are as much entitled to the protecting arm of the Board in making such revocations, even to form their own union, to be managed by their own mates, familiar with the plant processes and working conditions, as are those persuaded—as they were here

---

[3a] The Board introduced as an exhibit the jurisdictional paragraph of a pamphlet entitled Constitution and By Laws of the International Ladies Garment Workers Union. The remaining pages of the pamphlet are stapled together and cannot be read.

We cannot take judicial notice of these blocked off pages. They well may have provided (1) that the C. I. O. Union officials who offered to negotiate with the employer have no general or specific power to negotiate for a contract with any employer; or (2) that they could bargain only for a contract previously approved by a majority of the members of a union composed of members who are employees of several employers, although the contract may have the adverse vote of the employees of the negotiating employer; or (3) previously approved by the majority of those members who are employed by the negotiating employer; or (4) that the officials have no power to make any contract at all, but are mere agents to bring back proposals from the employer to be accepted by a majority vote of a union of employees of several employers; or (5) of the employees of the negotiating employer.

In situation (1) the employer is entitled to refuse to bargain. As to (2) and (4) there is presented the question whether a proposed contract offered by or to be approved by a majority of other employers' laborers, but opposed by his own, is one concerning which he may refuse to bargain without violating Section 8 (5) of the Act.

As to the others, the employer may be entitled to postpone consideration of an offer from the union officials until he knows the authority of the officials as agents, whether merely to propose or to close a bargain. Bargaining is a business transaction. An employer is entitled as are all business negotiators to know such facts. If the union officials have the power to close a contract at once, he may make one kind of an offer; if the offer has to go through the mill of a meeting or series of meetings of the rank and file of a union, he may make another.

Neither the Board nor this court can take judicial notice of the existence of any one of these situations possibly concealed in the blocked off pages of the exhibit, nor of the many other situations which union organization may cause. In each case the facts as to the form the organization may have must be proved by the Board before the Board or court can determine whether the Act has been violated.

by Busick—to accept the remote control of national unions.[4]

It appears that Busick was later succeeded by another C. I. O. organizer, not a worker in their or any plant. Even if Busick had been supplanted before the revocations and if there were then no evidence (as there is none) that this new C. I. O. organizer also was a racketeer, it was for the garment workers in the C. I. O. Union to determine whether they wanted to remain in it and risk the chance that they would be furnished with another betrayer like her predecessor.

■ Stripped to its essentials, the Board's holding is that these workers who had given their designations in 1937 to the C. I. O. Union have lost any right to revoke them because in the act of revocation they are joined, in seeking the Board's aid in establishing a new union, with a Mrs. Sheldon and three other garment workers formerly connected with the Brassiere Workers, which they had abandoned shortly before.

With the burden of proof on the Board that the revocations were invalid and that the C. I. O. Union was designated by a majority, there is not a word in the evidence from any source to show that Mrs. Sheldon, or any person signing the revocation document, had ever had any relationship with her employer other than "the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee" recognized and approved by the Supreme Court. Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 568, 50 S.Ct. 427, 433, 74 L.Ed. 1034.

We have referred to an organization committee with which respondent's managing officers met in July and August 1937. One Cannon was the leader of that committee, which had an amorphous self-organization preceding the incorporation of the Brassiere Workers. He had left the Brassiere corporation and joined the C. I. O. Union long before the revocations were executed. No member of his 1937 organizing committee was among the forty-four signers of that document. None of the forty-four signers is even charged with knowledge of the payment for the mimeographed paper circulated by Cannon, or

that one of his committeemen in 1937 had a discussion with respondent on $2.00 worth of the employee's time. The only knowledge they had concerning the employer was that in July and August 1937 it agreed with them and urged them to form some sort of an independent union, followed by the fact that it had for a year a bargain with a rival union.

Concerning Mrs. Sheldon, she, from the beginning in July 1937, had been opposed to Busick's attempt to organize her companions and had been in favor of their exercising their right to "form" their own union. It is interesting to observe that certain words in an address, made by her on September 6, 1937, to her fellow workers who opposed the strike Busick had called, are offered in the Board's brief as evidence of employer domination over her twenty months later, on March 1, 1939. These words were

"Why don't you say something instead of just standing there? Why don't you say that we will stick together for our own union, whether they [Busick's union] are in here or not? Isn't that right?"

Obviously, it was the right to make such an appeal to "form" an inside union that Congress intended to protect in Sections 1 and 7 of the Labor Act. The inference reasonably to be drawn from the Board's brief and its findings and comment is that a laborer loses her right to join or form a union if she knows that her employer prefers that she do so. That is to say, that all an employer has to do to destroy the laborer's congressional right to follow a certain course of conduct is to tell her that he advises her to exercise it.

Yet by such advice in July 1937, the garment worker is not only frustrated in opposing the Busicks then, but twenty months hence, with nothing intervening from her employer, not even a repetition of its preference for an inside union, she is so infected with some industrial disease that she puts in quarantine those attempting to revoke the designations of Busick's union, from which their revocations could not emerge.

Mrs. Sheldon was not only not one of Cannon's organizing committee of 1937, but it is uncontradicted that she was then but one of the "rank and file" of the garment workers. She later became one of the

---

[4] Cf. National Labor Relations Board v. Sterling Electric Motors, Inc., 9 Cir., 109 F.2d 194, 201.

signers of the articles of incorporation of the Brassiere Workers and some time later, in September 1937, was elected its chairman. The evidence shows and the Board admitted at the hearing that from that time to the revocations of the designations of the C. I. O. Union, neither the Brassiere Workers nor Mrs. Sheldon had any contact whatsoever with the respondent employer, except a year later, in September 1938, to lodge with respondent (and the Board) a claim of majority membership, and in October 1938, after the C. I. O. contract expired, to cause a price committee to consult with Dr. Bowen. The committee, which obtained a raise for all the employees, so acted that every employee, regardless of affiliation, could make her suggestion on the prices of the work on the garments. The Board finds nothing improper in the action of this committee and its action was warranted by the proviso of Section 9(a) of the Act. Busick's union was not shown to be making a similar request of respondent at that time.

The conduct of the Brassiere Workers under Mrs. Sheldon's chairmanship and the advice of their attorney, a Mr. Feingold, was most exemplary. As indicated, they pressed no demands on the employer until after the C. I. O. contract had expired. They made no disturbances among the garment workers, so destructive of the production of merchandise, the continued flow of which into interstate commerce is the sole warrant for the National Labor Relations Act. They had been warned in August 1937 by Board representatives concerning the Board's views of respondent's actions with Cannon's committee precedent to the incorporation. They initiated before the Board two proceedings for recognition by the Board under Section 9(c) of the Act, one in September 1937, which was denied without hearing in February 1938; and one in October 1938, which was never acted upon.

Later, in February 1939, attorney Feingold advised his clients that the Brassiere Workers was, in the opinion of a Board representative, a "company dominated union." Mrs. Sheldon and the other workers then resolved to abandon the Brassiere corporation and let it die through failing to pay the corporation franchise tax.

With regard to Mrs. Sheldon's three women associates on the committee organizing the Independent Group, they, like Mrs. Sheldon, were not on Cannon's 1937 committee nor were they shown to have had any connection with respondent up to the time of the signing of the revocations. None was dominated or was attempted to be dominated by respondent. None sought or received any favor from respondent, either personally or for any organization with which she was connected.

Another signer of the revocation document was Cecilia Behnke. Like Mrs. Sheldon, she was not one of Cannon's committee of August 1937 in the period prior to the incorporation of the Brassiere Workers. Subsequently she was elected treasurer of the corporation. No communication of any kind is shown between her and respondent, before or after her selection, much less dominion actual or attempted. She kept her accounts in a small loose leaf folder. After she abandoned the corporation she was selected treasurer of the Group. Her accounts for the latter consisted of two small loose leaf pages placed in the same folder as the loose leaf accounts of the corporation. We consider it absurd to contend that there is any significance in the fact that after the abandonment of the corporation she used the same folder for the accounts of the newly formed Group.

Even had the Brassiere Workers been a dominated union, it could not so infect its treasurer, innocent of any wrongdoing, that she, in turn, infected with dominion any subsequent union of which she became treasurer. Certainly she could not infect those revoking the C. I. O. designations.

With respect to these revocations, the situation here differs from those in National Labor Relations Board v. P. Lorillard Company, 62 S.Ct. 397, 86 L.Ed. ——, decided by the Supreme Court on January 5, 1942, reversing 6 Cir., 117 F.2d 921; National Labor Relations Board v. Automotive Maintenance Machinery Co., 62 S. Ct. 608, 86 L.Ed. ——, decided by the Supreme Court on February 16, 1942, reversing 7 Cir., 116 F.2d 350; and International Ass'n Machinists, etc., Local No. 35, etc., v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

In none of these cases was the Board seeking to compel the laborers to be represented in bargaining by a union dominated by an organizer bribed by respondent, from which union they had revoked their designations *prior* to the refusal of the employer to bargain with that union, with which the venal relationship had been ex-

posed. Here the revocations were on March 1, 1939, and the finding of the Board is that the refusal to bargain was on March 14, 1939. In National Labor Relations Board v. P. Lorillard Co., supra, the refusal to bargain was with a union "which was *at the time* the duly selected bargaining representative of a majority of Lorillard's employees." The C. I. O. union here was not "at the time" such a "duly selected" agent. Here the Board has not sustained its burden that respondent has refused to bargain "with the union shown to have had a majority on the *date* of [respondent's] refusal to bargain." Ibid. In National Labor Relations Board v. Automotive Maintenance Machinery Co., supra, the majority's revocation came after the date of the employer's refusal to bargain. Here it was before.

We hold that the designations of the C. I. O. Union, given in August 1937 during Busick's organization efforts, were properly revoked on March 1, 1939, after Busick's bribery was discovered; that the C. I. O. Union was not then or thereafter designated by a majority of respondent's productive workers as their bargaining agent; that respondent did not violate any provision of the Labor Act in refusing on March 14, 1939, to bargain with it, but that it would have committed a gross offense against its own workers, as well as against Section 8(1) and 8(3) if it had; and that we decline to enforce the several orders of the Board arising from its refusal to recognize the revocations.

(D) *The defunct Brassiere Workers.*

With regard to the Board's petition to disestablish the Brassiere Workers' corporation, the Board has shown no dominion over it in the twenty-two months up to its hearing. Moreover, since the evidence is uncontradicted that the corporation was abandoned by its members and deliberately left to expire for non-payment of taxes, the issue has become moot. We decline to decree its disestablishment.

(E) *The garment workers were exercising their right under Sections 1 and 7 of the National Labor Relations Act in forming the Independent Productive Group, and the Board erred in holding it should be destroyed by disestablishment.*

The Board did not respond to the request of the majority petitioners to aid them in forming a new organization, and thereafter the signers of the petition themselves formed the Group. The Board seeks to have us disestablish it.

As stated, the Board admitted at the hearing that the forty-four members of the Group constituted a majority of the respondent's workers in an appropriate unit for a labor organization. Another of the Board's arguments we are unable to follow is that it is evidence for destroying the Group by disestablishment, that the respondent dealt with the Group without a careful determination that it had such a majority. In other words, it is not the fact that a majority secures the congressionally recognized right to deal with the employer which is determinative, but whether such action so agrees with the employer's desire to deal with them that he immediately does so,—and this although if the employer did not negotiate with them he would violate the same congressional enactment.

We cannot agree with such an unreasonable thesis. The Supreme Court has held that an employer may express to employees his views on labor organizations,[5] but here the evidence is that respondent not only had nothing to do with the organization of the Group, but made no statement even of a preference to deal with it.

Nor can we follow the Board's argument that because some of the members of the Group, including one of the leading spirits, Mrs. Sheldon, and the treasurer, Miss Behnke, had formerly been members and the two women similarly active in the Brassiere corporation, the Group was a mere continuation of the former organization. They had abandoned that corporation by deliberate and express action. That corporation was not shown to have done anything under the dominion of the employer. No one in the Group had submitted to such dominion by the employer or accepted any benefit from it. Even more significant was their request that the Board itself participate in forming their new organization. All that was proved *concerning these Group members* is that some of them were urged by respondent in August 1937, eighteen months before, to exercise their right to form an inside union. An employer cannot so destroy for all time a right to organize which Congress created the Board to protect.

---

[5] National Labor Relations Board v. Virginia Electric & Power Co., 62 S.Ct. 344, 86 L.Ed. —, decided December 22, 1941.

In our opinion respondent would not have destroyed that right even if improperly it had urged employees already so minded to continue their efforts towards forming the Group. To hold otherwise would mean that an employer could force his employees into the union he desired by simply saying he preferred another union sought to be created by a majority of his workers, and urging them to join it. That there are employers who, though unlikely to bribe, would use such a device, cannot be denied. Congress did not intend to give employers such an implement to pervert an Act to protect their employees. Such conduct, if improper, may require the employer to cease and desist. To punish the employees by destroying their union would be a perversion and frustration of the very purposes for which the Act is created.

We hold that the Board has not offered any evidence, much less substantial evidence, that the Group should be disestablished. The Group was entitled to negotiate with respondent and the agreement it made with respondent on April 5, 1939, obtained rights for them which Congress intended should be protected and which we decline to destroy.

The petition of the Board is granted with respect to the above modified general cease and desist order to respondent based upon its bribery of Busick and the notices thereof. Otherwise it is denied.

Petition granted in part and denied in part.