# NATIONAL LABOR RELATIONS BOARD
## v. WM. TEHEL BOTTLING CO.
### No. 12178.

Circuit Court of Appeals, Eighth Circuit.
July 2, 1942.

N. Barr Miller, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Louis Libbin and Robert F. Proctor, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Whitney Gillilland, of Waterloo, Iowa (G. P. Linville, of Cedar Rapids, Iowa, and B. F. Swisher and Swisher, Cohrt & Gillilland, all of Waterloo, Iowa, on the brief), for respondent.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

GARDNER, Circuit Judge.

This case is before us on a petition of the National Labor Relations Board seeking enforcement of its order entered in a proceeding brought before it against the respondent wherein it was alleged that respondent had engaged in and was engaging in certain unfair labor practices. It was charged (1) that respondent had violated Section 8(5) of the National Labor Relations Act, 29 U.S.C.A. § 158(5), by refusing to bargain collectively with the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, Local 238, affiliated with the American Federation of Labor, as exclusive representative of all its employees on April 8, 9 and 10, 1940, upon request of the Union; (2) that it had violated Section 8(2) of the Act by instigating the formation of the association of its employees about March or April, 1938, and by dominating and interfering with the administration of said association and contributing financial and other support thereto, and by threatening and warning its employees to join said association, and by entering into a written agreement with said association in April or May, 1938; (3) that it had violated Section 8(1)

of the Act by interfering with, restraining and coercing its employees in the exercise of rights guaranteed them by Section 7 of the Act, 29 U.S.C.A. § 157.

The alleged acts of violation were put in issue by the answer of respondent. Upon hearing the Board sustained the charges, made specific findings of fact and conclusions of law, and based thereon entered its order directing respondent to cease and desist from (a) dominating or interfering with the formation and administration of United Beverage Workers Association, or of any other labor organization of its employees, and from controlling, financing, or giving other support to said association or any other labor organization of its employees; (b) giving effect to its contract with United Beverage Workers Association; (c) refusing to bargain collectively with International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, Local 238, as the exclusive representative of the truck drivers, bottle washers, warehousemen and helpers employed by respondent at its Cedar Rapids, Iowa, plant, excluding certain supervisory employees named; (d) in any manner interfering with, restraining or coercing its employees in the exercise of their right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the Act.

The order required respondent to take affirmative action by withdrawing all recognition from United Beverage Workers Association as representative of its employees upon request to bargain collectively with International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, Local 238, and to post the usual notices to its employees.

The respondent resists the petition for enforcement of the Board's order on substantially the following grounds: (1) The evidence is insufficient to justify a finding that it violated Section 8(1), 8(2) and 8(5) of the Act; (2) changed conditions have made the order of the Board unenforceable; (3) the dissolution of respondent by the death of William Tehel makes the order of the Board unenforceable.

For the sake of brevity, we shall refer to the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers,

Local 238, as the Union, and to the United Beverage Workers Association as the Association.

Respondent owns and operates at Cedar Rapids, Iowa, a beverage bottling plant, at which it engages in the mixing and bottling of soft drinks and in the sale and distribution of beer and soft drinks. It is a co-partnership composed of William Tehel, Irma Holloway, Melvina Pitlik, and Anna Tehel. The assets and business of respondent were acquired from William Tehel about January 1, 1939. Under exclusive franchise agreements, it purchases from certain companies beverage ingredients which it bottles and sells within a prescribed area and it also sells beverages under its own trade name. Of its purchases a substantial percentage comes from points outside the State of Iowa.

In considering the question of the sufficiency of the evidence to sustain the findings, we must assume that the Board, whose province it was, resolved all conflicts in the evidence against the respondent. As bearing upon the charge that respondent instigated the formation of the Association and dominated and interfered with its affairs, the Board might have believed from the testimony that the formation of the Association was decided upon at a meeting of respondent's employees held at its plant during working hours in the spring of 1938; that there was present at the meeting one Milo Spinler, who was foreman over the bottlers with authority to give them orders, direct them what to do and what not to do, and who was recognized and referred to by the employees as representing the management. Manager Tehel was also present and addressed the employees, informing them that "he had just got back from Des Moines; they were having a little trouble down there, labor trouble," that "he would kind of hate to see something like that happen here, and wondered if we couldn't start a little company union of our own." It was following this suggestion that one of the employees proposed to obtain a copy of a contract used by an unaffiliated union at another plant to serve as a form for a contract and by-laws. At the next meeting officers were elected, and Foreman Spinler was named a member of the grievance committee. The Association subsequently held regular monthly meetings, often at the plant, notices of all meetings being posted on a bulletin board at the plant. At times meetings were held at the home of Assistant Manager Holloway, and following the business session the meetings were converted into social gatherings, at which Tehel, the manager, and Holloway, the assistant manager, were at times present. The minutes of a meeting held in July, 1938, contain the following: "This meeting was held at the home of Merle Holloway. He served refreshments at his own expense." The minutes of a meeting held in October, 1938, contain the following: "Meeting was adjourned. Refreshments were served. This meeting was held at the plant."

Tehel and Holloway indicated their good will and approval of the Association by cash contributions and other small gifts. Tehel dealt with the Association without definite knowledge as to the number of employees it represented, and entered into a contract with it some time in May, 1938. Foreman Spinler was a member of the grievance committee at the time of the signing of the contract. A new contract was signed in April, 1939, the same grievance committee representing the Association.

The Union began organizing the employees in April, 1940, and by April 8 it claimed a majority representation, at which time it made demand upon Mr. Tehel for negotiations, and on his refusal the Union called a strike. About April 30, 1940, respondent entered into another yearly agreement with the Association. Concerning the signing of this contract, Mr. Tehel testified: "They (the grievance committee) came in and wanted to know if I would sign up again, and I says, 'Well, is all the boys satisfied working under their contract here, or do they want to go A. F. of L.' 'Well,' he says, 'they all want to sign up again.' I says, 'All right. Be sure they all want to sign up, because,' I says, 'I don't want no trouble around here.' "

On the morning of April 9, as the employees were entering the plant, they were directed by the Association president and by Assistant Manager Holloway, to attend an Association meeting at the plant before beginning their work. This meeting was attended by all of the employees, including Foreman Spinler, and it was held during working hours without loss of pay to the employees. Following an announcement by the president that the purpose of the meet-

ing was to take a vote on whether the employees wanted to continue with the Association or join the Union, ballots were obtained from respondent's office and distributed.

It is observed that the Association was organized immediately following a meeting of employees held at the plant during working hours, at which Mr. Tehel suggested the formation of a company union to avoid labor trouble. The Association manifestly met with the approval of Mr. Tehel and Mr. Holloway. Foreman Spinler actively participated in its affairs, being a member of its most important committee. As said by the Supreme Court in International Association of Machinists, etc., v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 88, 85 L.Ed. 50: "Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure."

In N. L. R. B. v. Virginia Power Co., 314 U.S. 469, 62 S.Ct. 344, 348, 86 L.Ed. ——, the court said: "If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure exerted vocally by the employer may no more be disregarded than pressure exerted in other ways."

The facts and circumstances which we have related were, we think, sufficient to warrant the Board in finding, as it did, that the Association was dominated, interfered with and supported by respondent. The law contemplates that an employee organization shall be free from such interference or dominance. The Board might well have believed from the evidence and circumstances that the formation of the Association was brought about through promotion efforts of respondent, contrary to the provisions of the Labor Act. Wilson & Co. v. N. L. R. B., 8 Cir., 123 F.2d 411; N. L. R. B. v. Christian Board of Publication, 8 Cir., 113 F.2d 678.

Did respondent refuse to bargain collectively with representatives of its employees as found by the Board? It contends that the Union was not the collective bargaining representative of its employees. In support of this contention it is urged that at the meeting of employees held at the plant on April 9, a vote was taken by secret ballot to determine whether the employees favored the plant Association or the Union, and the vote was 10 to 9 in favor of the Association. As has already been noted, this meeting was promoted by respondent's officers and was held at the plant during working hours without loss of pay to employees. The meeting was attended by all the employees, including Foreman Spinler. When the vote was announced as being 10 to 9 in favor of the Association, one employee protested that the salesmen and Foreman Spinler should not be permitted to vote, but the president of the Association held that all employees were entitled to vote. The Board found that the truck drivers, bottlers, bottle washers, warehousemen, and helpers, excluding office and clerical employees, salesmen, and supervisory employees, constituted a unit appropriate for collective bargaining within the meaning of the Labor Act. No evidence was offered to dispute the appropriateness of such a unit, and the Board's determination of an appropriate unit is therefore conclusive. Pittsburgh Plate Glass Co. v. N. L. R. B., 8 Cir., 113 F.2d 698.

As to the vote taken at the meeting on April 9, it is to be noted that it was taken at a meeting of the illegal Association held at the plant during working hours. The employees were directed to attend the meeting by the assistant manager, and a notice was posted on the plant bulletin board. It was attended by Foreman Spinler, who took part in the balloting and by five salesmen who did not belong to the unit determined by the Board. Under such circumstances, the selection of a bargaining representative can not be held to reflect the free choice of the employees. N. L. R. B. v. Christian Board of Publication, supra; N. L. R. B. v. Skinner & Kennedy Stationery Co., 8 Cir., 113 F.2d 667. It may well be that Foreman Spinler and the five salesmen voted in favor of the Association, and it may well be that the nine employees who had membership cards in the Union voted for the Union. We must, therefore, reject the contention that the vote taken at the meeting on April 9, was binding on the Board as indicating that a majority of the employees favored the Association as their representative.

The Board found that on April 9, 10 and 30, 1940, respondent refused to bargain collectively with the Union as the

representative of its employees. It is first contended that the evidence is not sufficient to sustain the finding that the respondent in fact refused to bargain with the representatives of the Union. The evidence shows that on April 9, 1940, Union representative Frisby called Mr. Tehel by telephone, and after introducing himself requested an appointment for a collective bargaining conference. To this request, Mr. Tehel said he was too busy and hung up the telephone. A few minutes later Frisby again called for an appointment, but Tehel replied, "I haven't got time to talk to you." Mr. Tehel testified that he told Frisby on the second telephone call that, "I haven't got time to talk to you today." He not only refused to see Frisby, but he expressed no willingness to see him at any other time. This conduct warranted the Board in finding a refusal to bargain within the meaning of the Act. N. L. R. B. v. Somerset Shoe Co., 1 Cir., 111 F.2d 681. Because of Tehel's refusal to meet with the Union representative, a strike was called on the morning of April 10. Frisby and a Mr. White, representing the Union, went to the plant on that day and requested Mr. Tehel to bargain with them. Tehel refused on the ground that he had a contract with the Association, saying that when that contract expired he would talk with the representatives. The Labor Act does not require an employer to reach an agreement with the representatives of its employees, but it does require that he negotiate with such representatives. The existence of the contract with the dominated Association was no excuse for a refusal to negotiate or bargain with the representatives of a majority of the employees.

It is also urged that the Union did not represent a majority of the employees. It is doubtless true that the employer may request reasonable proof that the Union represents a majority of the employees, and in the absence of such proof need not bargain if he in good faith doubts the Union's majority. It is observed, however, that respondent made no inquiry as to whether or not the Union represented a majority of its employees at the time of the request for negotiations, and it did not base its refusal to negotiate upon any claim of lack of majority in the Union. That being true, it can not now complain that the Union failed to prove its majority at the time of requesting negotiations as a justification for such refusal. N. L. R. B. v. Somerset Shoe Co., supra; N. L. R. B. v. Clarksburg Pub. Co., 4 Cir., 120 F.2d 976; N. L. R. B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652.

It is admitted that ten of the thirteen employees in the unit approved by the Board as an appropriate unit had signed Union membership application cards by April 8, 1940, but respondent contends that this admitted fact is overcome because at a meeting of the employees held at the plant on April 9, the vote then taken stood 10 to 9 in favor of the Association and against the Union, and it is also urged that the signatures to the application cards were obtained by duress and misrepresentation, and that a number of those who signed cards later resigned and did not recognize the Union as their representative at the time of the hearing before the Board. We have already adverted to the vote taken at the meeting called by the Association on April 9, and need give it no further consideration. The important and controlling date is not the time of the hearing before the Board, but the time at which respondent refused to bargain with the Union representatives. Following that refusal a strike was called and Tehel interrogated the employees relative to their Union affiliations. Three of those signing cards, upon being interrogated by Tehel, repudiated their membership, but such repudiation was manifestly due to the improper and coercive conduct of the respondent and had no bearing upon the question of whether the Union represented a majority of employees at the time of respondent's refusal to bargain. The Board found from the evidence that such defections were caused by respondent's unfair labor practices, and hence they could not change the bargaining representative previously selected. N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; N. L. R. B. v. Blanton Co., 8 Cir., 121 F.2d 564; N. L. R. B. v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. ——. Neither do we think the membership cards may be collaterally attacked by respondent on the ground that they were obtained by duress and misrepresentations. The evidence does not sustain this contention. The so-called misrepresentations were not in any event such as to affect the validity of these instruments. N. L. R. B. v. Dahlstrom Metallic Door Co., 2 Cir., 112 F.2d 756.

It is undisputed that ten employees had signed application blanks for membership

in the Union prior to April 8, 1940, when respondent refused to bargain with the representatives of the Union. That represented a majority of employees constituting the unit. As already pointed out, the refusal to negotiate with the Union's representatives was not based upon any claim that the Union did not represent a majority of the employees. If respondent desired to raise that question, it should have done so at that time, and having failed so to do can not now urge it.

We have already considered respondent's contention that changed conditions have made the order of the Board unenforceable. Respondent points to the vote taken at the plant on April 9, as indicating a change in the preferences of the employees, but we agree with the Board that this vote is of no significance or relevancy.

It is finally urged that the death of William Tehel makes the order of the Board unenforceable. The Wm. Tehel Bottling Company is a co-partnership, and it is attempted to show the death of William Tehel by an affidavit appearing in the appendix of respondent's brief but not found any other place in the record. The Supreme Court in N. L. R. B. v. Newport News, etc., Co., 308 U.S. 241, 60 S.Ct. 203, 208, 84 L.Ed. 219, had before it a record in which it appeared that the lower court had been advised in a brief that certain changes of fact had taken place. The court said: "The statute expressly deprives the reviewing court of power to consider facts thus brought to its attention. The case must be heard on the record as certified by the Board. The appropriate procedure to add facts to the record as certified is prescribed in Section 10(e) of the Act [29 U.S.C.A. § 160(e)]."

The affidavit, if it may be referred to, discloses that the business is being carried on by the surviving partners. The Circuit Court of Appeals of the Sixth Circuit, in N. L. R. B. v. Colten, 105 F.2d 179, 183, after observing that it was the employing industry that was sought to be regulated by the Labor Act, said: "The term 'co-partners' may not then be regarded as more than a term of description, or as denoting a legal entity which alone is subject to the command of the order. * * * Moreover, a cease and desist order is of the nature of an injunction, and its affirmative provisions analogous to those of one that is mandatory. It would be an implausible contention that the death of a partner subject to restraint relieved survivors of its burdens."

We conclude that as the findings of the Board are sustained by substantial evidence, its cease and desist order will be enforced.