## NATIONAL LABOR RELATIONS BOARD v. APPALACHIAN ELECTRIC POWER CO.

### No. 5134.

Circuit Court of Appeals, Fourth Circuit.

Jan. 10, 1944.

A. Norman Somers, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, General Counsel; Howard Lichtenstein, Asst. General Counsel; Jacob I. Karro and Margaret M. Farmer, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Edmund M. Preston and T. Justin Moore, both of Richmond, Va. (John L. Abbot, of Lynchburg, Va., and Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., on the brief), for respondent.

Before SOPER, DOBIE, and NORTH-COTT, Circuit Judges.

DOBIE, Circuit Judge.

This is a petition by the National Labor Relations Board (hereinafter called the Board) for the enforcement of its order issued against the Appalachian Electric Power Company (hereinafter called the Company) following the usual proceedings under section 10 of the Wagner Act, 29 U.S.C.A. § 160. The Board found that the Company had violated section 8(1) and (5) of the Act, 29 U.S.C.A. § 158(1, 5), by interfering with, restraining, and coercing its employees in the exercise of their rights guaranteed them in section 7 of the Act, 29 U.S.C.A. § 157, and by refusing to bargain collectively with Local Union B-112 of the International Brotherhood of Electrical Workers (hereinafter called the Union), after the Union had been certified by the Board as the proper exclusive representative of the employees within an appropriate unit. We are now called upon to determine (1) whether the Board's findings are supported by substantial evidence and (2) whether the Board's order as issued is valid.

The Company, a Virginia corporation with its principal place of business at Roanoke, Virginia, is engaged in the production, transmission and distribution of electric power in the States of Virginia and West Virginia. The Company employs 1,652 non-supervisory employees in four divisions, one of which is known as the Roanoke-Lynchburg division. Each division is in turn divided into districts. For example, the Lynchburg district of the Roanoke-Lynchburg division employs approximately 150 employees, while the Roanoke district, comprising the remaining portion of the Roanoke-Lynchburg division, employs approximately 350 employees.

At the hearing in the representation case, the Company vigorously objected to the establishment of a bargaining unit confined exclusively to the Lynchburg district. The Company felt that the Roanoke-Lynchburg divisional unit was the smallest and most desirable unit for the purposes of collective bargaining. The Board, how-

ever, found, over the objection of the Company, that the employees of the Lynchburg district, separate and apart from the employees of the Roanoke district, constituted an appropriate bargaining unit.

On February 21, 1942, pursuant to an election held by the Board in which 81 out of 88 employees in the prescribed Lynchburg unit voted, 41 employees voted in favor of the Union as their bargaining agent and 40 employees voted against such representation. The Union was thereafter duly certified by the Board on March 14, 1942.

In the latter part of 1941, Whitefield, Assistant Division Manager of the Roanoke-Lynchburg division, began a study of possible wage adjustments in the Roanoke area as a result of the rise in the cost of living and the manpower shortage. In February and April of 1942 he talked the matter over with Argabrite, Executive Vice-President of the Company. The question of a wage increase in the Lynchburg district was also discussed. Finally, on May 12, 1942, Argabrite telegraphed Whitefield his approval of raises in the Roanoke area, while at the same time Argabrite advised Whitefield that no adjustment should be made in Lynchburg regarding a wage increase on account of the pending bargaining conference with the Union, which was scheduled to be held 13 days later.

We entertain no doubt about the propriety of the Roanoke raise insofar as it affected the Roanoke employees. The Company realized that if it had also granted a voluntary raise in Lynchburg without the consent of, or consultation with, the Union, immediately prior to the appointed conference, the Board might have deemed this a violation of the Act in that it might tend to undermine the prestige and worth of the bargaining agent which the employees had selected. Great Southern Trucking Co. v. N. L. R. B., 4 Cir., 1942, 127 F.2d 180, certiorari denied 317 U.S. 652, 63 S.Ct. 48. Thus, while the Company may have been willing to grant wage increases in Lynchburg, the exact terms and extent of these increases would necessarily depend upon the outcome of the subsequent collective bargaining with the Union.

We are therefore unable to accept the finding of the Board that the Company committed an unfair labor practice in granting a wage increase to employees at Roanoke and in temporarily withholding a similar increase from employees at Lynchburg. Since the Board had certified the Union as the exclusive bargaining agent for the Lynchburg employees, the Company was no longer justified in treating alike problems concerning terms and conditions of employment in the Roanoke and the Lynchburg plants. The Lynchburg employees had chosen a representative for collective bargaining purposes but the Roanoke employees had not. In this connection, the record seems to disclose that efforts to unionize the Roanoke district had met with little, if any, success. It is, therefore, more than probable that a vote of all the employees in the Roanoke-Lynchburg division would have been adverse to the Union as the collective bargaining agency for the entire Roanoke-Lynchburg division. The Board must have known this fact.

Thus, disparate action of the Company with respect to the Roanoke employees was dictated by the Board itself when it ruled in the representation case that the Roanoke-Lynchburg division was not a proper unit for collective bargaining purposes. Accordingly, we refuse to accept the Board's finding in this respect, since it would be tantamount to vesting the representative of one group of employees with unwarranted control over employees other than those represented by it.

The Company, desiring to allay any possible unrest in Lynchburg after the granting of the Roanoke raise, advised the Lynchburg employees that their needs would be considered in the ensuing conference with the Union. Accordingly, Argabrite instructed Whitefield to tell the Lynchburg employees that "nothing was being done to hurt them in any way; that their time will come when we will negotiate with the Union on * * * the 26th."

Whitefield in turn relayed these instructions to Martin, District Superintendent, telling Martin: "to get his foremen together, any other men that he wanted to, and tell them that there was an increase at Roanoke, and they would probably hear about it, and may get it mixed up. We wanted them to know definitely the reason they were not getting one at Lynchburg at that time was because of the fact that we were about to bargain with the union and we couldn't make an increase for the Lynchburg employees pending those negotiations with the union".

Martin passed this information on to the foremen who then so advised their men.

The Board has carved excerpts from the evidence which seemingly tend to show that the Lynchburg employees were given the impression by the foremen that a raise had been denied them because the Union stood in the way. We have replaced these isolated statements in their proper place in the record and we have examined their context in the light of all the testimony. We find an absence of substantial evidence to support the position taken by the Board since the isolation of the statements relied on. by the Board served to torture the true meaning.

The record is clear and convincing that the Company's instructions to its supervisory employees to be entirely neutral concerning the Union were strictly carried out. Any variation therefrom was an inconsequential circumstance which has been magnified beyond its just desserts by the Board. We find no act or statement by either the Company or its responsible officials which may be reasonably construed as having constituted an effective obstacle to the free expression of the wishes of the employees. We refuse to pervert an inadvertent statement by a supervisory employee into a malicious and designed attempt by the Company to crush and render useless the Union.

We now turn to a consideration of the second alleged unfair labor practice of the Company. This concerns one Painter, a non-supervisory employee at Lynchburg, who had "voted against the Union wholeheartedly" at the election. He later decided that it would be in the best interests of all the employees to eliminate the Union from the plant. Accordingly, acting on his own initiative, he addressed a letter to Jackson, Lynchburg district manager, which stated:

"We fellow employees hold great esteem for you as our manager and have appreciated every advantage that you have given us in the past. And through careful thinking we do not want to be governed or affiliated with any union.

"We the undersigned acknowledge with our signature."

Painter solicited signatures for this document during the week of May 18, 1942, and was successful in procuring 66 names. The Board makes much of the fact that Painter acted on Company property and time without having his wages docked.

Yet these same rights and privileges were accorded the Union and our decision in N. L. R. B. v. Mathieson Alkali Works, 1940, 114 F.2d 796, adequately disposes of the Board's contention that the Company unlawfully acquiesced in the circulation of the petition. See, also, N. L. R. B. v. Sun Shipbuilding & Drydock Co., 3 Cir., 1943, 135 F.2d 15; and E. I. Du Pont De Nemours & Co. v. N. L. R. B., 4 Cir., 116 F. 2d 388.

It is true that Reynolds, a general foreman of the Company, discussed the petition with Painter, inquired as to Painter's progress with the petition, and even copied the names of the employees who had signed the petition. For this obvious indiscretion Reynolds was promptly and effectively reprimanded by his superior officer. There is no evidence whatever in the record to show that this action on the part of Reynolds had any effect in inducing a single employee to sign the petition. Indeed, there is nothing here to show that Painter, in soliciting signatures to his petition, even mentioned to any employee his conversation with Reynolds.

The damaging effect of Reynolds' action, if any, is amply counterbalanced by the prophetic remark of the Union representative, McIntosh, who frankly admitted: "He didn't think the company had done anything deliberately, or any of its supervisors in connection with this petition; that it was apparently what it appeared to be, an expression, free expression of the men, but that he did think that they—some small acts or gestures of the foremen prior to the election which they might have done entirely unknowingly might have given the employees an idea that the company was against a union, and that he felt that the Board would hold that an unfair labor practice, and then he said to Preston, (counsel for the Company), 'You know how little things like that can be magnified and built up when it comes to preparing a case, and we'll work them for all they are worth.'"

We now come to the pivotal issue and main pillar upon which the Company's position rests. Was the Company justified in accepting the unsolicited petition of a large majority of its employees in the appropriate bargaining unit as conclusive evidence of the fact that the Union no longer was their representative for collective bargaining purposes, so as to warrant the refusal of the Company to bargain with the

Union as the duly credited representative of the employees? We think not, despite our holding that the Company has not been guilty of the other unfair practices as found by the Board and above discussed by us.

■ The instant case, in this respect, is therefore different from our recent decision in Great Southern Trucking Co. v. N. L. R. B., 139 F.2d 984, decided January 10, 1944. Nevertheless, we feel that the doctrine enunciated in the Great Southern Trucking Co. case is equally applicable here, namely, that the primary responsibility for the ascertainment of the true will of the employees is properly placed upon the Board and not upon the Company or the courts.

■ Accordingly, when the Board, after following the proper statutory procedure, has given certification to a unit, this certification must be honored by the Company so long as it remains in force, at least for a reasonable time. To assume that the Board's certification speaks with certainty only for the day of its issuance and that a Company may, with impunity, at any time thereafter refuse to bargain collectively on the ground that a change of sentiment has divested the duly certified representative of its majority status would lead to litigious bedlam and judicial chaos. Indeed, if the Company's contention were correct, the Board's certification might even be obsolete and subject to nullification by an interim informal Gallup poll vote on the very day of its issuance. Thus, the certification reports the will of the majority as of the day of the election but it necessarily does not issue until after the following sequence of events has taken place: (1) the count of the votes, (2) the report of the Regional Director to the Board, (3) the notification of the results to the parties, (4) the passage of time for the parties to file objections either to the election or to the report, (5) the consideration of such objections, if any, by the Board, and (6) the Board's final decision, perhaps weeks or months later! Thus, the holding of constant and repeated elections is quite impracticable.

It is therefore obvious that the Company's position is clearly incompatible with the Congressional intent since a resulting certification might be, pursuant to the Company's theory, subject to defeasance almost before the certification could be even announced.

Inasmuch as a major objective of the Wagner Act is to bring about a contract binding on both parties with some fair degree of permanence, we feel that a certification must be endowed with a longevity sufficient to accomplish its essential purpose. The operative life of a certification should be at least a reasonable time, dependent upon the circumstances of the individual case. Surely Congress in establishing the machinery for the enforcement of the Act could not have intended to defeat the administration of the Act by denying such measure of stability to a certification. In this connection, we quote with approval the following statements which appear in the Board's brief:

"The very nature of the subject matter with which the Act deals leaves no room for (the Company's) contention. Employer-employee relations entail a flowing stream of human relations and attitudes, continually modified by innumerable environmental variations, by day to day changes in desires and moods and by the bargaining process itself. It may be, therefore, that each successive day presents a different picture of employee attitudes, and that successive redeterminations of the employees' choice might record with greater precision the shifting currents in the bargaining unit. For this very reason, however, a showing of present change cannot serve to abate the effect of the Board's certification. Neither the Board nor the courts can stand by continually, and constantly reexamine the state of the ever-changing stream to redetermine the authority of a recently designated representative. Necessarily the line must be drawn at some point in time; and when the fact-finding body, pursuant to statutory authority and upon a fair and secret election, makes a determination of the will of the employes, its certification must be accorded a durability consistent with the practical administration of the legislative policy.

\*       \*       \*       \*       \*

"Under (the Company's) construction, however, this Congressionally encouraged process of peaceful negotiation would have to be conducted with the knowledge on the part of both bargainers that the authority of one of them was currently subject to revocation by the first shift of employee sentiment that might occur. To the recalcitrant employer, such an interpretation would be an invitation to procrastinate. To the law-abiding employer it would be

a deterrent to the honest expenditure of time and effort in bargaining, for he would have no assurance whatever that, by the time the negotiations were completed, the Union would still be in a position to join in a binding contract. To the Union, it would be a spur to hasty and unconsidered action in order to anticipate the possibility that at some point during extended good-faith bargaining enough employees might waver in their support to reduce the Union's majority, even momentarily, to a minority."

Returning to the instant case, we think that the Company's position is reduced to the claim that the Board's certification, based upon a Board hearing and the advantageous anonymity of a secret election supervised by the Board, is to be vitiated by the circulation of an informal and open petition less than ten weeks after the certification was issued. We refuse to accept this interpretation of the Act, for it would preclude the adequate protection of the very rights which the Act was designed to secure. N. L. R. B. v. Botany Worsted Mills Co., 3 Cir., 1943, 133 F.2d 876. The Company may not take it upon itself thus to disregard a certification which at least at that time, remained in full force and effect.

Since the Act does not prescribe the length of time for which any given certification shall remain valid, we accept the legal conclusion of the Board that the Company must recognize the certified representative for a reasonable period of time after the issuance of the certification, or until the certification is either set aside or replaced by an appropriate action of the Board in accord with the Act. Cf. Valley Mould & Iron Corp. v. N. L. R. B., 7 Cir., 1940, 116 F.2d 760.

We have examined with great care the cases relied on by the Company, especially N. L. R. B. v. Hollywood-Maxwell Company, 9 Cir., 1942, 126 F.2d 815; N. L. R. B. v. Whittier Mills Co., 5 Cir., 1940, 111 F.2d 474; N. L. R. B. v. Remington Rand Co., 2 Cir., 1938, 94 F.2d 862. The first of these cases, although the most favorable to the Company's position, is yet a very far cry from the situation in the instant case.

In the Hollywood-Maxwell case, a C. I. O. Union was certified by the Board as the exclusive bargaining agent of the employees. When the employees discovered that the C. I. O. organizer had been bribed by the President of the Company, they wrote a letter to the Board, requesting a revocation of the certification. The Ninth Circuit Court of Appeals held that, under these circumstances, the Company was justified in refusing to bargain with the Union after the date of the letter of revocation. Thus the illegal action of both the Company and the Union was deemed sufficient to vitiate the Board's certification. These facts render the doctrine expounded by the Court clearly inapplicable to the case before us.

We must remember that if the employees do wish to be represented by some organization other than the union certified by the Board, they may always avail themselves of the statutory procedure of the Act itself, Section 9(c), 29 U.S.C.A. § 159(c), in order to guarantee that their genuine desires can be ascertained and respected.

The Board therefore properly held that a reasonable time had not elapsed since the election and certification, and that the certification still remained in full force and effect, under the circumstances of the instant case. The Board, accordingly, refused to regard the petition as constituting adequate justification for the Company's refusal to bargain collectively with the Union.

Since the Board's order was invalid in certain respects and broader than its findings in other respects, we hereby modify the order and direct that it be enforced only with respect to sections 1(a), 2(a) and 2(b), which require the Company to bargain collectively with the Union.

Petition to enforce order modified and affirmed.

SOPER, Circuit Judge (dissenting).

It is established by the foregoing opinion of the court that the labor relations between the Appalachian Electric Power Company and its employees were entirely free from fault, on the part of either management or men until the company refused to bargain with agents of the union; and that when the union offered to bargain, it did not actually represent the company's employees. Moreover, it is found by the court that the Labor Board made two mistakes in handling the proceedings: (1) a mistake of judgment in splitting off Lynch-

burg from the company's Roanoke-Lynchburg division and establishing the Lynchburg employees as a separate bargaining unit; and (2) a mistake of fact in holding that the subsequent repudiation of the union by the Lynchburg employees was induced by the company, although there was no substantial evidence to support the finding. The surprising conclusion has nevertheless been reached that the company was wrong in refusing to bargain, and it is now ordered, notwithstanding the mandatory terms of the statute, to bargain with agents whose authority to represent the employees has been revoked.

The determination of a bargaining unit of employees and the certification of bargaining representatives selected by the employees are matters committed by § 9 of the statute to the Labor Board, and the decision of the Board is not subject to judicial review under § 10 of the statute. However, when the employer is charged with unfair labor practice in failing to bargain with the certified representatives of a bargaining unit, the validity of the certification is subject to review by the courts; and if it is found that the Board has acted arbitrarily or capriciously, or has abused its discretion, its action is not binding on the court. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701, affirmed 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251; National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 133 F.2d 876; National Labor Relations Board v. Delaware-New Jersey Ferry Co., 3 Cir., 128 F.2d 130; American Federation of Labor v. National Labor Relations Board, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347.

The Board's reason for establishing Lynchburg as a separate unit, as the opinion of the court points out, was the fact that a vote of all of the employees of the Roanoke-Lynchburg division would probably have been adverse to the union, and on this account Lynchburg was given a separate status. Even here the vote was close—41 to 40 for the union. The identity of interests of the employees at the two plants was complete, and the mistake in separating them became apparent as soon as wages at Roanoke were raised and the Lynchburg employees promptly repudiated the union, whose status, as their representative, impeded a simultaneous raise at Lynchburg. This history of the Board's action may properly be considered in determining the propriety of the order of the Board now under review.

The second mistake of the Board was in deciding that the action of the Lynchburg employees in withdrawing support from the union was due to the interference and coercion of the company. The court has found that there was no substantial evidence to support this finding and that the company was entirely blameless. Nevertheless, the court concludes that in future bargaining the employees must submit to representation by an agent that they desire to repudiate. No precedent in support of this conclusion can be found amongst the numerous cases considered by the courts.* There are many decisions which hold that if an employer influences his employees by unfair labor practices to withdraw support from their chosen representative, he must continue to bargain with them through their representative until, in the determination of the Board, the effect

---

* The only case upon which the court relies is National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 133 F.2d 876; but in case that the employer was found to have acted improperly in suppressing the information which it had received that the employees had withdrawn their support from the union. In this connection the court said (133 F.2d at pages 881, 882): "The Board has within its authority power to ascertain the will of the majority of a given group of employees by election or other means. The election method is chosen, we take it, because secret ballot is regarded as the most effective way of getting an untrammeled expression of the desire of the electorate. Surely it is not to be defeated of all its effectiveness by a communication, undisclosed to the Board, repudiating, immediately after the election was held, the ballot count. The employees in this case, if they wished to change their minds concerning a bargaining agent, could have asked the Board for another election. If the Board had arbitrarily refused it within a reasonable time then we might have a case where a question could be raised whether it had done its duty under the statute. But those are not the facts of this case. We conclude that there is no merit in Botany's contention that the Board erred in its order that the employer must bargain with the certified bargaining agent."

of his illegal acts has been dissipated.** Obviously these cases have no relevance when the employer is exonerated from all fault.

Even in cases in which the union's loss of a majority is traceable to wrongful conduct on the part of the employer or the employees, it has been decided that the Board's order to recognize the union cannot be enforced when it fails to face the realities of the situation. Such an order was reversed in National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, where the employer indulged in certain anti-union statements and actions and subsequently the union lost its majority through the justifiable discharge of employees who had participated in a sit-down strike; and such an order failed of enforcement in National Labor Relations Board v. Hollywood-Maxwell Co., 9 Cir., 126 F.2d 815, where the men revoked their choice of the union when it was discovered that the union leader had been bribed by the president of the company. If in such cases the Board's certificate may be set aside by the courts, on what ground can we refuse to uphold the employees' right to choose their bargaining agent when no fault can be attributed either to them or to their employer?

Only one answer to this question has been or can be made; and that upon reflection is seen to be totally inadequate in the present situation. It is said that the Board's certificate must be given vitality for at least a reasonable time and may not be set aside at every transient whim or change of mind on the part of the employees, for otherwise orderly administration of the statute would be impossible. This is of course true; but it is still necessary in every set of circumstances to de-

cide what is a reasonable time. The Board reached its conclusion, that a reasonable time had not elapsed, by finding that the employer had been guilty of wrongful conduct whose evil influence still persisted; but this finding has now gone out of the case through the opinion of the court, and nothing is left to support the Board's order but an empty and lifeless phrase. To give it effect in this case will uphold the Board's power, but it will deny rights to working men which the Board was created to protect.

** National Labor Relations Board v. P. Lorillard Co., 314 U.S. 512, 62 S. Ct. 397, 86 L.Ed. 380; International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; National Labor Relations Board v. Franks Bros. Co., 1 Cir., 137 F.2d 989; National Labor Relations Board v. Medo Photo Corp., 2 Cir., 135 F.2d 279; National Labor Relations Board v. Burke Machine & Tool Co., 6 Cir., 133 F.2d 618; National Labor Relations Board v. Clinton E. Hobbs Co., 1 Cir., 132 F.2d 249; National Labor Relations Board v. Wm. Tehel Bottling Co., 8 Cir., 129 F.2d 250; National Labor Relations Board v. Moltrup Steel Products Corp., 3 Cir., 121 F.2d 612; Oughton v. National Labor Relations Board, 3 Cir., 118 F.2d 486; National Labor Relations Board v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753; Valley Mould & Iron Corp. v. National Labor Relations Board, 7 Cir., 116 F.2d 760; Bussmann Mfg. Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 783; National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632.